**In re CARTER PAPER COMPANY, INC., Debtor.**

**Frank L. CARTER and Carter Paper Company, Inc.**

v.

**Martin A. SCHOTT, Trustee, et al.**

**Bankruptcy No. 90–10449.
Adversary No. 96–1038.**

United States Bankruptcy Court,
M.D. Louisiana.

April 16, 1998.

Jacques F. Bezou, Covington, LA, for plaintiffs.

Martin A. Schott, Baton Rouge, LA, trustee.

Pamela Magee, Baton Rouge, LA, for trustee.

## REASONS FOR ORDER STRIKING JURY TRIAL DEMAND

LOUIS M. PHILLIPS, Bankruptcy Judge.

### *Introduction*

This adversary proceeding seeks, on behalf of Carter Paper Company, Inc. (CPC), debtor in the captioned case, and Frank L. Carter, the purported owner of the debtor, judgment against Martin A. Schott (Schott or Trustee), trustee of the CPC bankruptcy estate, for "intentional and wilful breach of fiduciary duty" to CPC and Carter, in failing either to prosecute or abandon an anti-trust claim (that the plaintiffs allege existed as an estate asset) until after the claim prescribed. The matter currently before the Court is the trustee's motion to strike the plaintiff's demand for a jury trial. For the reasons given below, the court finds that the plaintiff is not entitled to a jury trial and will grant the trustee's motion.

### *Facts*

On April 6, 1990, three creditors of CPC filed an involuntary Chapter 7 petition against CPC.[1] This court entered an order for relief on June 12, 1990. Purportedly, CPC's assets included an antitrust and unfair trade practices claim against rival paper companies (the claim). CPC's bankruptcy schedules failed to mention the claim. CPC alleges that the Trustee knew of the claim, and that despite repeated requests from debtor's counsel, the trustee failed to file an action on behalf of the estate or to abandon

---

1. A notation in the case file suggests that the debtor later converted the case from involuntary to voluntary, but the date and circumstances of this change are not apparent. Whether the case was ever converted to a voluntary case is irrelevant for present purposes.

the claim so that CPC could bring an action.[2] *Id.* The claim prescribed on January 11, 1994.[3] On February 1, 1994, three weeks after the prescription date, Schott abandoned the estate's interest in the claim. A few weeks later Schott filed a report of no distribution, and in July the court closed CPC's case.

In 1996, CPC filed a petition in state court[4] alleging that Schott had violated his fiduciary duty to the estate and that debtor's counsel had committed legal malpractice. Schott removed the case to the United States District Court for the Middle District of Louisiana, which referred the matter to this Court. The bankruptcy case has been reopened. This Court severed and remanded all claims against parties other than Schott, concluding that there was no jurisdictional nexus between those claims and the action against the trustee. (The other defendants (previous lawyers and almost lawyers for CPC) had not asserted cross-claims or third party claims against the Trustee, and advised the Court they did not intend to assert such.) As a consequence of the severance, the Court instructed CPC to amend its complaint to incorporate only the allegations relevant to the action against the Trustee. In the complaint, as amended, Carter asserts a right to trial by jury and has consented to such before this Court. Implicitly, Carter has con-sented to issuance by this Court of a final judgment if trial by jury is not available. The Trustee has brought a motion to strike CPC's demand for a jury trial. Bankruptcy Rule 7012(b); Federal Rule of Civil Procedure 12(f).

### *Jurisdiction*

■ The complaint in this adversary proceeding alleges that Schott improperly administered the bankruptcy estate and caused a loss to CPC. This Court has subject matter jurisdiction over this proceeding. 28 U.S.C. § 157(b)(1). *See Matter of Baheth Construction Co., Inc.,* 118 F.3d 1082 (5th Cir.1997) (action seeking damages from trustee and surety for trustee's pursuit of a temporary restraining order against the plaintiff constituted, at the very least, a matter related to a case under title 11 within the meaning of 28 U.S.C. § 157(a); therefore bankruptcy court had jurisdiction). The Trustee has consented to issuance by this Court of a final judgment but denies that CPC has a right to trial by jury. CPC alleges a right to trial by jury, but has consented to such before this Court, at least implicitly consenting to the issuance by this Court of a final judgment. This Court, having subject matter jurisdiction, infers from the express consents of the parties the authority to issue a final judgment (even

2. A preliminary question raised by these facts is whether a bankruptcy trustee even has the power to abandon an asset that has not been listed in the debtor's bankruptcy schedules. Obviously, if Schott had no power to abandon an unscheduled asset, he can't be liable for his failure to do so. Although language in one case is broad enough to be cited for the proposition that a trustee in bankruptcy is without power to abandon an unscheduled asset, see *Krank v. Utica Mutual Insurance Co.,* 109 B.R. 668, 669 (E.D.Pa.1990) ("If, however, the debtor fails to list a claim as an asset, the trustee cannot abandon the claim because he or she will have had no opportunity to determine whether it will benefit the estate"), most cases that have addressed the issue indirectly reached a contrary conclusion. These cases state that a trustee's abandonment of an asset is irrevocable unless one of two exceptions applies. The first exception is that the debtor has misled the trustee concerning the worth of the asset. The second is that the asset is unscheduled. See *Tschirn v. Secor Bank,* 123 B.R. 215, 218 (E.D.La.1991); *In re Ozer,* 208 B.R. 630, 633 (Bankr.E.D.N.Y.1997); *In re Bryson,* 53 B.R. 3, 4 (Bankr.M.D.Tenn.1985); *In re The Burch Compa-*

*ny, Inc.,* 37 B.R. 273, 274 (Bankr.D.S.C.1983). If the fact that an asset is unscheduled can serve as a ground for revocation of its abandonment, then it perhaps follows that the trustee must have the power to abandon the asset in the first place. This Court, solely for the purposes of this jury trial right proceeding, assumes the (implicit) majority position that a bankruptcy trustee does have the power to abandon an unscheduled asset, reserving to the trustee the right to urge, through Rule 12(b)(6) or Rule 56 motions, a contrary position.

3. Although the complaint alleges that the action prescribed on January 11, the correspondence between the trustee and the debtor's counsel indicates that counsel originally informed the trustee that the prescription date was January 15, 1994.

4. Actually, CPC is co-plaintiff, along with Frank Carter, the principal shareholder and moving force behind CPC. CPC was the debtor in bankruptcy; Carter's interest in this action is not clear. For reasons of efficiency and simplicity, the court uses "CPC" to refer to both plaintiffs.

if this proceeding is only related to a case under Title 11). 28 U.S.C. § 157(c)(2).

■ A bankruptcy court can preside over a jury trial only with the approval of the district court and the consent of all parties. 28 U.S.C. § 157(e); *In re Clay*, 35 F.3d 190 (5th Cir.1994). This Court previously has obtained approval from the Honorable District Court to conduct jury trials pursuant to § 157(e), with consent of the parties. The parties have consented to trial by jury before this Court, in the event trial by jury is required. The Trustee disputes the right to jury trial, but consents, if such a right exists, to trial by jury here.[5]

### The Supreme Court, Jury Trials, Bankruptcy Cases

The United States Supreme Court has published a line of cases, *Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 53 S.Ct. 50, 77 L.Ed. 185 (1932); *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *Granfinanciera v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), and *Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990), which embodies the

Supreme Court's understanding of the interplay between the Seventh Amendment[6] right to a jury trial and the inherently equitable nature of the bankruptcy courts. An examination of this series of cases will provide guidance in resolving the present dispute.

*Schoenthal, supra,* began as a suit in equity brought by the Irving Trust Company (the trustee) to recover $1500 in preferences paid by a bankruptcy debtor to Morris and Fannie Schoenthal (the Schoenthals). The trustee claimed to have no adequate remedy at law, and sought an equitable decree declaring the payments preferential and directing the Schoenthals to pay to the trustee the amount of the preferences with interest and costs. 287 U.S. at 93, 53 S.Ct. at 51.

The Schoenthals sought trial by jury. The trial court denied the motion and, after trial, entered judgment in favor of the trustee. The Second Circuit affirmed. *Irving Trust Co. v. Schoenthal,* 54 F.2d 1079 (2nd Cir. 1932). The Supreme Court reversed, holding that the defendants were entitled to trial by jury. 287 U.S. at 97, 53 S.Ct. at 52.

The Supreme Court invoked the rule that suits in equity are unavailable if law provides

5. This Court is therefore faced with both a statutory basis for jury trial and the parties' consent, if jury trial is necessary, neither of which were factors before the court in *In re Clay*, 35 F.3d 190 (5th Cir.1994). What would the *Clay* court do with what must look to it like a horribly misguided love-feast? On one hand the *Clay* court places tremendous emphasis on the importance of consent, "Because one function of Article III is to protect litigants, courts have accorded significant if not dispositive weight to consent and waiver.... Consent is a key factor empowering magistrates to conduct jury proceedings," *id.*, at 196, manifesting an unspoken belief that anyone would be crazy to consent to trial by jury before a bankruptcy judge. On the other hand, the *Clay* court gives the impression of having peered over the jurisdictional abyss only to back up (off)— after so circumscribing its approach to bankruptcy jurisdiction that actually to speak of what it has seen would require exposing the bankruptcy jurisdictional structure as, in fact, having no clothes. From this view the *Clay* court allows itself a few observations, such as that a bankruptcy court's jurisdiction is essentially incompatible with the right to a jury trial. "We may sometimes fail to acknowledge the equitable roots of certain bankruptcy cases and hence find a right to a jury trial when we should not." *Id.*, at 194. Since this case, essentially between the debtor and the Trustee and concerning abandonment of

estate property, is unquestionably within this court's jurisdiction, *In re Clay* gives an early indication that CPC has no Seventh Amendment right to a jury.

*In re Markos Gurnee Partnership,* 182 B.R. 211, 222 (Bankr.N.D.Ill.1995) raises another interesting argument based on a bankruptcy court's jurisdiction. That court held that an action against a trustee for breach of fiduciary duty can only be brought in the bankruptcy court that presided over the case. The court's rationale was that such an action can only arise in the context of a bankruptcy case, and that consequently the bankruptcy court has "arising in" jurisdiction under 28 U.S.C. § 1334. This Court is convinced by the above reasoning that it has jurisdiction, and *In re Clay, supra,* teaches that bankruptcy jurisdiction, equitable in nature, is inconsistent with a right to trial by jury. Unfortunately, the finding of jurisdiction does not completely resolve the issue. If the jurisdictional statute leads to one result and the Seventh Amendment analysis leads to another, it is the jurisdictional statute that must yield.

6. The Seventh Amendment to the United States Constitution provides, in relevant detail: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

a remedy. It also observed that in England preferences were historically triable at law. The facts failed to support the trustee's assertion that it had no adequate remedy at law. 287 U.S. at 96–97, 53 S.Ct. at 52. The preferences were money payments of ascertained and definite amounts. The bill disclosed no facts calling for an accounting or other equitable relief. Consequently, the defendants had a right to trial by jury. *Id.*

■ The rule of *Schoenthal* is that a preference action against a party who has not filed a claim against the bankruptcy estate is a legal action, entitling the parties to the protection of the Seventh Amendment. In 1932, when *Schoenthal* was decided, preference actions were not considered part of the bankruptcy process; they could be brought in state courts as well as bankruptcy courts. *Id.*, at 94–95, 53 S.Ct. at 51. Recognition of the fact that the preference action "constitute[d] no part of the proceedings in bankruptcy," *id.*, led the Court to distinguish the preference action from the bankruptcy process and generated the conclusion that utilizing the power to avoid a preferential transfer did not invoke the bankruptcy court's equitable jurisdiction. Since the Schoenthals had not filed a claim against the estate, the outcome of the preference action would not require the bankruptcy court to consider disallowance of their claim and would not alter the *pro rata* distribution of the estate. The "proceedings in bankruptcy," therefore, were seen by the court as being bound up in the allowance or disallowance of claims; the process necessary to effectuate a *pro rata* distribution of the res, or estate, being administered by the trustee.

*Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) also involved a preference action, but this time the defendant had filed a claim against the estate. The issue was whether the filing of a claim

precluded the creditor's invocation of the Seventh Amendment right to a jury trial previously recognized in *Schoenthal. Id.*, at 325, 86 S.Ct. at 470.

Katchen's Bonus Corner, Inc. (the company) borrowed $50,000, issuing notes to memorialize the debts. Louis Katchen (Katchen), an officer of the company, was a surety on the notes. After a fire severely damaged the company's assets, Katchen placed the company's funds in a trust account under his control. He made some payments on the notes with funds from the trust account and others from his personal funds. Bankruptcy followed. Katchen filed one claim against the bankruptcy estate for rent (he owned the property on which the business operated) and another for the payments made from his personal funds on the company's notes. Landy, the trustee, claimed that the payments from the trust fund to the creditors were voidable preferences. He sought judgment against Katchen for the amount of the preferences.[7] The referee overruled Katchen's objection to jurisdiction and rendered judgment for Landy. The referee further ruled that he would allow Katchen's claims only when Katchen satisfied the judgment. The District Court and the Court of Appeals affirmed. Katchen took his case to the Supreme Court. *Id.*, at 325–26, 86 S.Ct. at 470–71.

Katchen relied on *Schoenthal.* He argued that there was no legal difference between a preferred party who had not filed a claim against the estate and a preferred party whose claim would be allowed only if he surrendered his preference. Katchen conceded that the Bankruptcy Act precluded allowance of a creditor's claim until the creditor had surrendered any voidable preferences.[8] He maintained, however, that the Act did not confer jurisdiction on a bankrupt-

---

7. Apparently, the trustee's argument was that Katchen benefitted from the payments since he would have been liable to the creditors as surety. The trial court must have viewed this reduction in Katchen's potential liability as a preference.

8. 11 U.S.C. § 93(g) provided:
 The claims of creditors who have received or acquired preferences, liens, conveyances, transfers, assignments or encumbrances, void

or voidable under this title, shall not be allowed unless such creditors shall surrender such preferences, liens, conveyances, transfers, assignments, or encumbrances.
The Court observed that the language of this section was concerned with creditors rather than claims, and concluded that the allowance of a claim could therefore be conditioned on surrender of preferences unrelated to the claims.

cy court to order a preference surrendered. Since a District Court had to order the surrender of the preference, the trustee's action against Katchen effectively arose outside the bankruptcy case. Therefore, Katchen was entitled to a jury trial. Katchen concluded by asserting that any other interpretation of the Act would violate the Seventh Amendment. *Id.,* at 327–28, 86 S.Ct. at 471–72.

The Court rejected his contentions. *Id.,* at 328, 86 S.Ct. at 472. While the Bankruptcy Act did not expressly authorize bankruptcy courts to order claimants to surrender preferences, the absence of congressional direction was not conclusive. The matter was to be determined by the Court "after due consideration of the structure and purpose of the Bankruptcy Act as a whole, as well as the particular provisions of the Act brought in question." *Id.,* at 328, 86 S.Ct. at 472. After extensive statutory analysis, 382 U.S. at 330–35, 86 S.Ct. at 473–76, the Court found that the Bankruptcy Act did empower the referee to order the surrender of a preference unrelated to the preferred party's claim. *Id.,* at 335–36, 86 S.Ct. at 476. The Court then addressed Katchen's argument that this reading of the statute violated his Seventh Amendment right to a jury trial.

The Court stated that Katchen might have been entitled to a jury trial if he had presented no claim in the bankruptcy proceeding. Nevertheless, when the same issue arose as part of the process of allowance and disallowance of claims, it was triable in equity. Referring to bankruptcy courts, the Supreme Court observed:

> These courts are essentially courts of equity, and they characteristically proceed in summary fashion to deal with the assets of the [estate] they are administering. The bankruptcy courts have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession. They also deal in a summary way with matters of an administrative character.

382 U.S. at 327, 86 S.Ct. at 471. The power to allow, disallow, and reconsider claims, of basic importance in the administration of a

bankruptcy estate, is exercised in summary proceedings. This power to allow or disallow claims is essential to the performance of the duties imposed upon the bankruptcy court. The whole process of proof, allowance, and distribution is an adjudication of interests claimed in a res. *Id.,* at 329–30, 86 S.Ct. at 472–73.

When Katchen filed a claim against the bankruptcy estate, he converted his legal claim into an equitable claim to a *pro rata* share of the res under the court's administration, a share which could neither be allowed nor determined until Katchen gave up his preference. Since bankruptcy courts have jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession, and since proceedings of bankruptcy courts are inherently proceedings in equity, there is no Seventh Amendment right to a jury trial when the creditor submits a claim. *Id.,* at 336–37, 86 S.Ct. at 476–77.

■ In both *Schoenthal* and *Katchen* the trustee brought an action to avoid a preferential transfer. In *Schoenthal* the defendant was allowed a jury trial, while in *Katchen* he was not. The only significant factual difference between the cases is that Katchen filed a claim, and the Schoenthals did not. Clearly, the act of filing a claim took Katchen beyond the protection of the Seventh Amendment. By filing a claim against the estate, Katchen converted his legal claim to an equitable one and invoked the summary jurisdiction of the bankruptcy court. His claim had become part of the bankruptcy process. The Schoenthals, by contrast, never entered the bankruptcy arena, and therefore the claim against them did not implicate the claims allowance process. While Katchen's claim would be disallowed if he refused to surrender his preference, the Schoenthals had no claim to be disallowed. The *Katchen* case shows that a claim which would otherwise be considered legal becomes equitable if it involves or is part of the "bankruptcy process," and is thereby triable, as an equitable matter, by the bankruptcy court.[9] The apparent

---

9. As mentioned above, we are not faced with a question of whether this Court has jurisdiction to

enter a final judgment, given the consent of the parties. Were this not the case, we point out,

key to resolving the Seventh Amendment question, then, is to determine whether or not the action at issue invokes the equitable jurisdiction of the bankruptcy court by virtue of the action—there are many, perhaps overlapping ways of saying it—being "part of" and/or "integral to" and/or "a component of" and/or "an administrative matter involving or necessary to effectuate the bankruptcy proceedings" and/or "the administration of the res under constructive control of the court for purposes of determining claims to that res and/or effecting distribution of the res to those having claims against it."

The Supreme Court confirmed this lesson twenty-three years later, in *Granfinanciera v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). The question in *Granfinanciera* was whether a party who had not submitted a claim against an estate had a right to a jury trial in an action by the trustee to recover a fraudulent transfer (rather than a preferential transfer as in *Schoenthal*), notwithstanding an intervening jurisdictional scheme, set forth in 28 U.S.C. § 157, that deemed actions to recover (both preferential and) fraudulent transfers "core proceedings" subject to resolution, by final judgment, by the bankruptcy court without a jury. 492 U.S. at 36, 109 S.Ct. at 2787. The Supreme Court found that the defendant retained its Seventh Amendment rights.

In 1983, Chase & Sanborn filed a petition for reorganization. In 1985, Nordberg, the trustee, filed an action against Granfinanciera seeking recovery of $1.7 million in allegedly fraudulent transfers. Granfinanciera requested a trial by jury. The bankruptcy court denied the request, holding that a suit to recover a fraudulent transfer was a core proceeding which would have been tried by a court of equity in eighteenth century England. The Court entered judgment against Granfinanciera in the amount of $1,500,000. *Id.*, at 37, 109 S.Ct. at 2787. The district court affirmed. The Eleventh Circuit also affirmed, finding that Granfinanciera had no statutory right to a jury trial under 11 U.S.C.

§ 548(a)(2).[10] The Court further ruled that the Seventh Amendment was inapplicable because actions to recover fraudulent conveyances are equitable, and bankruptcy proceedings are inherently equitable. The Eleventh Circuit read *Katchen v. Landy* to say that Congress may, pursuant to its powers under the Bankruptcy Clause, convert a creditor's legal right into an equitable claim and displace any Seventh Amendment right to trial by jury. The Eleventh Circuit found that Congress had done so by designating fraudulent conveyance actions "core proceedings." *Id.*, 492 U.S. at 37, 109 S.Ct. at 2788; 28 U.S.C. § 157(b)(2)(H).

The Supreme Court reversed. 492 U.S. at 38, 109 S.Ct. at 2788. The Court began its analysis by providing the framework that lower courts should use when determining whether a cause of action created by statute, such as that for the recovery of fraudulent conveyances, invokes the protection of the Seventh Amendment:

First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first. If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as fact finder.

*Id.*, at 42, 109 S.Ct. at 2790. In resolving the first question, regarding the historical antecedents of the action, the Court relied on *Schoenthal* to find that actions to recover preferential or fraudulent transfers were considered actions at law in 18th-century England. *Id.*, at 43–47, 109 S.Ct. at 2791–93.

Next, the Court turned to the second part of its analysis: the nature of the relief sought by Nordberg. *Id.* Again relying on *Schoen-*

---

notwithstanding the abyss recoiled from in *Clay*, that *Katchen* involved a final judgment by a bankruptcy court.

**10.** Throughout the rest of this opinion, citations to statutes will be to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

*thal,* the Court found that the fraudulent transfer in this case was indistinguishable from the preferential transfer in *Schoenthal:*

Indeed, in our view *Schoenthal* removes all doubt that respondent's cause of action should be characterized as legal rather than as equitable. In *Schoenthal,* the trustee in bankruptcy sued in equity to recover alleged preferential payments, claiming that he had no adequate remedy at law. As in this case, the recipients of the payments apparently did not file claims against the bankruptcy estate. The Court held that the suit had to proceed at law instead, because the long-settled rule that suits in equity will not be sustained where a complete remedy exists at law, then codified at 28 U.S.C. § 384, "serves to guard the right of trial by jury preserved by the Seventh Amendment and to that end it should be liberally construed." The Court found that the trustee's suit—indistinguishable from respondent's suit in all relevant respects—could not go forward in equity because an adequate remedy was available at law. There, as here, "the preferences sued for were money payments of ascertained and definite amounts," and "the bill discloses no facts that call for an accounting or other equitable relief."

492 U.S. at 48–49, 109 S.Ct. at 2793–94. The Court concluded that Nordberg sought a legal remedy.

After deciding that the historical antecedents of the action were legal and that the nature of the remedy sought was also legal, the Court turned to the third step in its analysis: whether Congress had permissibly assigned resolution of Nordberg's claim to a non-Article III adjudicative body that does not use a jury as fact finder. The Court determined that such an assignment was permissible only when the claim involved public rights. The Court expended considerable effort explaining why a legal action involving public rights did not necessitate a jury trial, but in the end it found that Nordberg's action did not involve public rights and that the defendants were entitled to a jury. 492 U.S. at 55, 109 S.Ct. at 2797. The Court finished by saying:

There can be little doubt that fraudulent conveyance actions by bankruptcy trustees ... are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res.

*Id.,* at 56, 109 S.Ct. at 2798.

*Granfinanciera* is, of course, about power. The jurisdictional statute, 28 U.S.C. § 157, purports to allow bankruptcy courts to issue final judgments, without juries, in both preference and fraudulent conveyance actions by designation of those actions as "core proceedings." *See* 28 U.S.C. §§ 157(b)(2)(F), 157(b)(2)(H). As pointed out, now about a million times, it is thought that Congress thought it was taking its cue from *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), wherein, through Justice Brennan (the author of *Granfinanciera*), the court (or part of it) said, in refuting an argument presented by the appellants, "But the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages." *Id.,* at 71, 102 S.Ct. at 2871.[11]

The Court in *Granfinanciera* observed that before 1978, preference actions were not part of the bankruptcy process,[12] 492 U.S. at 56, 109 S.Ct. at 2798; citing *Schoenthal,* 287 U.S. at 94–95, 53 S.Ct. at 51, and that Congress had, by the coalescence of the 1978 Code and 1984 jurisdictional statute, proposed to eliminate a party's right to trial

---

**11.** For one out of the million or so references, *see Matter of Wood,* 825 F.2d 90, 93 (5th Cir.1987): "In response to *Marathon,* Congress altered the placement of bankruptcy jurisdiction by creating a statutory distinction between core and non-core proceedings and restricting the power of bankruptcy courts to adjudicate the latter."

**12.** Throughout the opinion, the Court used the terms "preferential transfer" and "fraudulent transfer" almost interchangeably. Since the distinctions between the two are irrelevant to this case, I will follow the Court's lead.

by jury by designating the fraudulent conveyance as a "core proceeding." 28 U.S.C. § 157(a)(2)(H).

Congress simply reclassified a pre-existing, common-law cause of action that was not integrally related to the reformation of debtor-creditor relations and that apparently did not suffer from any grave deficiencies. This purely taxonomic change cannot alter our Seventh Amendment analysis. Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by re-labeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity.

492 U.S. at 60–61, 109 S.Ct. at 2800. This passage illustrates the fundamental teaching of *Granfinanciera.* The court had already stated in *Schoenthal* that a party who had not filed a claim against a bankruptcy estate was entitled to a trial by jury on a preference action brought against him. The rationale, as stated above, was that the preference action was not part of the bankruptcy process. The Court in *Granfinanciera* held that Congress could not alter the Seventh Amendment analysis by moving a preference action from outside the bankruptcy process to inside. Further, it is the province of the judicial power to determine the actual nature of an action; *i.e.,* equitable or legal, and for an action to be equitable, it must have been either recognized as equitable prior to the existence of Congress (*i.e.,* grafted into Article III and, by extension, the Seventh Amendment of the Constitution), or sufficiently demonstrate the characteristics of such an equitable action if given subsequent recognition as an action cognizable in the courts. The province of Congress, on the other hand, within the context of the jury trial right, is limited to the power (as described by the judiciary) to create statutory schemes and assign matters involving public rights to non-Article III judges without juries. That the Supreme Court is reaffirming the primacy of the judicial power to determine Congressional power in circumscribing judicial power by assigning matters to non-Article III tribunals to be tried without juries is clear throughout the *Granfinanciera* opinion.

In essence, the Court in *Granfinanciera,* in looking back to the Bankruptcy Act, can be seen as embracing the proposition that Congress, in promulgating prior statutes (including the jurisdictional statute) recognized the limit of Congressional power to delineate the scope and nature of equitable processes (or proceedings) and reached it. Conversely, through the promulgation of the subsequent jurisdictional provisions, Congress, failing to heed its historical awareness of its limitations, exceeded its authority by trying to tinker with the definition, scope, nature (or whatever you want to call it) of the bankruptcy (i.e., the particular equitable) process.

The dissent in *Granfinanciera* argued that the court's decision was a repudiation of *Katchen v. Landy. Id.,* at 71–72, 109 S.Ct. at 2806. The majority disagreed, stating that *Katchen* "confirms this analysis." *Id.,* at 57, 109 S.Ct. at 2798. The Court explained that the holding in *Katchen* did not depend solely upon the inherently equitable nature of bankruptcy courts. The critical factor was the bankruptcy court's "having 'actual or constructive possession' of the bankruptcy estate, and its power and obligation to consider objections by the trustee in deciding whether to allow claims against the estate." *Id.*

The Court read *Schoenthal* and *Katchen* as holding that a creditor's right to a jury trial on a preference claim depends upon whether the creditor has submitted a claim against the estate. 492 U.S. at 58, 109 S.Ct. at 2799. Granfinanciera had not filed a claim against the estate, so Nordberg's fraudulent conveyance action did not implicate the process of allowance and disallowance of claims. Nor was the preference/fraudulent transfer action integral to the restructuring of debtor-creditor relations. The Court read *Katchen* and *Granfinanciera* as harmonious. *Id.,* at 58–59, 109 S.Ct. at 2799.

*Langenkamp v. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343, reaffirmed *Katchen v. Landy* just as *Granfinanciera* reaffirmed *Schoenthal.* The debtors were Oklahoma financial institutions. Langenkamp was the trustee in the debtors' Chapter

11 case. At the time of filing, Culp[13] held savings certificates issued by the debtors. *Id.*, at 43, 111 S.Ct. at 330. Within the 90-day period immediately preceding bankruptcy, Culp redeemed some of the savings certificates. *Id.* Since he also retained some of them, he was a creditor when the bankruptcy case was filed in 1994. Culp filed timely proofs of claim. *Id.* Approximately one year later, Langenkamp instituted a preference action under § 547(b) to recover the money Culp had received immediately prior to the bankruptcy. After bench trial, the bankruptcy court found for Langenkamp. *Id.*, 498 U.S. at 42–45, 111 S.Ct. at 331. On appeal, the Tenth Circuit reversed on the issue of Culp's entitlement to a jury trial. *In re Republic Trust & Sav. Co.*, 897 F.2d 1041 (10th Cir.1990). Citing *Granfinanciera* and *Katchen*, the Tenth Circuit held that "those appellants that did not have or file claims against the debtors' estates undoubtedly were entitled to a jury trial on the issue whether the payments they received from the debtors within ninety days of the latter's bankruptcy constituted avoidable preferences." *Id.*, at 1046. The Tenth Circuit further held that the creditors who had claims, including Culp, were entitled to a jury trial because the trustee's actions to avoid the transfers were plenary rather than summary proceedings involving the process of allowance and disallowance of claims. *Id.*, at 1047.

The Supreme Court reversed in a per curiam opinion. *Langenkamp*, 498 U.S. at 44, 111 S.Ct. at 331. The Court explained that *Granfinanciera* stood for the proposition that a creditor who files a claim against a bankruptcy estate triggers the process of allowance and disallowance of claims, thereby subjecting himself to the equitable jurisdiction of the bankruptcy court. If the trustee then files a preference action, that action becomes part of the claims-allowance process, and is triable only in equity. The creditor's claim and the preference action become "integral to the restructuring of the debtor-creditor relationship." Consequently, the right to a jury trial disappears. Once a creditor like Culp files a proof of claim, he places himself within the equitable jurisdiction of the bankruptcy court. *Id.*, at 44–45, 111 S.Ct. at 331–32. There is no mention in the case of the public rights analysis, as the Court is obviously within what it considers already-plowed ground.[14]

At this juncture we can glean primary threads from the Supreme Court bankruptcy/jury trial cases:

■ First—The bankruptcy process is the process by which a res, under the constructive possession of the bankruptcy court, is administered for the purpose of allowing, disallowing, organizing, and prioritizing the claims of creditors in, to, and upon the res— referred to by the Court as the restructuring of the debtor-creditor relationship;

■ Second—A creditor who makes a claim in, to, or upon the res has invoked the equitable jurisdiction of the bankruptcy court to determine matters involving the allowance of the claim—referred to by the Court as triggering the process of allowance and disallowance of claims or the claims allowance process. This process must be completed before the res under constructive possession of the court can be distributed.

■ Third—The bankruptcy process (or, in the old parlance, the bankruptcy "proceed-

---

**13.** There were other creditors in the same position as Culp, but for simplicity's sake his name is used to represent them all.

**14.** The discussion in terms of subjecting one's self to the jurisdiction of the bankruptcy court, or of triggering the equitable claims allowance process, should not be confused with the case law determined by waiver of the right to a jury trial through choice of forum. See *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). By filing a claim a creditor does not "choose" the bankruptcy forum (as opposed to another) within which to liquidate his claim and does not choose to waive the jury trial right (as opposed to exercising it in another forum, *vis a vis* the claim). The choice is either to have a claim against the estate or not. Withholding the claim is tantamount to relinquishing the claim since the creditor has no alternative venue in which to present it. If the choice is to assert the claim (in the only forum available), then the choice constitutes a decision that whatever jury trial right might exist regarding claims of the estate against the claimant (in the nature of preferences or fraudulent transfers, for example) ceases to exist.

ings") is an inherently equitable process [15] which may employ private claims and causes of action (or have such related to it), but utilizes such, through the trustee, as any other private litigant, subject to the non-bankruptcy party's right to jury trial.

■ Fourth—Congress, essentially, has no power, notwithstanding its Article I authority to pass uniform laws respecting bankruptcies, to determine the scope of the bankruptcy process as it intersects with a party's right to jury trial within a particular proceeding. It is for the Supreme Court to determine the extent of the equitable nature of (and therefore matters integral to) the bankruptcy process.[16]

From these four main threads, we distill a two-pronged bankruptcy construct, established by the Supreme Court, within which proceedings are to be analyzed to determine whether a jury trial right exists under the Seventh Amendment.

■ **Prong 1. *The Claims Administration Prong.*** The claims administration prong consists of the process by which the trustee organizes claims against the res for the purpose of allowance against the estate and its property. The duty of the trustee here is to best ensure that bad claims are objected to, good claims allowed, and all claims are organized according to applicable ranking or prioritization law. Proceedings

inherent in or integral to this process—say, the determination of whether a claimant has received an avoidable transfer so as to preclude allowance of the claim until the transfer is avoided and disgorged—are equitable so that, notwithstanding that a creditor has a claim which arises under and must be fixed according to state law, if the claim is asserted within the bankruptcy process against property of the estate, the allowance of that claim is an equitable proceeding.

■ **Prong 2. *The Administration of the Res Prong.*** Clearly, given the foregoing Supreme Court opinions, equitable administration of the res does not include the utilization of private causes of action against persons who are not parties in the bankruptcy case process. So, fraudulent transfers, preferences, and the liquidation of pre-petition state law contract or tort claims by the bankruptcy estate against third parties are not inherently equitable. The administration-of-res-prong, therefore, is initially shorn (equitably speaking) of the tools of collection. However, there is much involved in the administration of the res that would immediately come to mind as being inherent to the bankruptcy process:

(1) Identification of estate property;

(2) Securing estate property by means of possession, insurance, establishment of central accounts, etc.;

---

**15.** The Fifth Circuit has recognized that bankruptcy jurisdiction is "largely equitable" and "nigh mutually exclusive of cases or controversies at law in which there is a right to a jury trial." *In re Clay*, 35 F.3d 190, 194 (5th Cir. 1994).

**16.** Here the Supreme Court seems to approach thin ice, as pointed out by the dissenting opinions in *Granfinanciera*. "[T]he Court [demonstrates a] cramped view of Congress' power under the Bankruptcy Clause to enlarge the scope of bankruptcy proceedings ... Today, the Court ... places a straightjacket on Congress' power under the Bankruptcy Clause: a straightjacket designed in an era, as any reader of Dickens is aware, that was not known for its enlightened thinking on debtor-creditor relations," 492 U.S. at 89, 109 S.Ct. at 2815 (dissenting opinion of White, J.); "[I]t would be improper for this Court to employ, in its Seventh Amendment analysis, a century-old conception of what is and is not central to the bankruptcy process, a concep-

tion that Congress has expressly rejected. To do so would, among other vices, trivialize the efforts Congress has engaged in for more than a decade to bring the bankruptcy system into the modern era." *Id.*, at 93, 109 S.Ct. at 2817 (dissenting opinion of Blackmun, J.). Congress has the power to pass the law. An action which would have been an action at common law prior to the Constitution is an equitable action if it involves a claim in a bankruptcy case, only because Congress has established, statutorily, the bankruptcy case and the bankruptcy claims process. At bottom, the dissent requires focus upon the fact of the existence of the bankruptcy process itself and of Congress's inherent power to create it. The majority seems to be saying that Congress can create an equitable process, but is limited in determining the scope of the equitable nature of the process by the pre-Constitution scope of equity jurisdiction. This essentially deprives Congress of the authority to confect the bankruptcy system in a way that is too different from what has gone before (way before).

(3) Retention of professionals, such as real estate persons, auctioneers, appraisers, lawyers, accountants, etc., to provide the trustee with information concerning value or to assist in the process of reducing property to money for ease of distribution;

(4) If necessary or appropriate, management or operation of particular assets for purposes of maximizing value.

These components of res administration boil down to one objective—the maximization and preservation of estate property until the various claims against the property can be sifted through, organized, objected to, and/or fixed so that the rightful creditors can receive the most value on account of their claims.[17]

### Is CPC's claim a claim against the estate, so that it falls within the Claims Administration Prong?

■■■ Given the focus within the Supreme Court opinions upon Prong One of the bankruptcy process (the Claims Administration Prong), the Court should logically begin its analysis with an examination of the nature of CPC's claim to determine whether it is a claim against the estate. If it is, then it necessarily implicates the process of allowance and disallowance of claims, and the above line of cases makes clear that there can be no jury trial. To determine whether this action against a bankruptcy trustee is a claim against the estate, the court must submerge itself into the murky depths of the various explications of bankruptcy trustee liability, wherein many have, analytically

speaking, perished. We hope to emerge, if soiled, at least alive.

A bankruptcy trustee's function is set forth in § 323(a): he is the representative of the estate. As the representative of the estate, he has certain duties. For Chapter 7 cases, those duties are set forth in § 704. One of them is to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." § 704(1). CPC is a party in interest,[18] and, for purposes of this discussion, will be assumed to be one of the parties that Schott had a duty to protect under § 704(1).

CPC alleges that by neither pursuing the antitrust claim nor abandoning it until after it had prescribed, Schott failed to fulfill his responsibilities as trustee because (i) he failed to collect a particular asset of the estate and failed to reduce it to money; or (ii) he failed properly to exercise his abandonment power under § 554, to jettison the action from the estate back to CPC so that it could pursue the action itself. For purposes of this motion, the court assumes the validity of CPC's allegations. The next question to be answered is: does CPC have, and is it asserting, a legally cognizable claim against the bankruptcy estate through Schott, and if so, what law creates it?

One might expect that Congress would have included in the Bankruptcy Code a provision detailing the extent and nature of a trustee's liability for breach of his fiduciary duty to the estate, since the Code creates the position of bankruptcy trustee and sets forth

---

**17.** There is probably a third distinct prong, though it has not been embraced by the Supreme Court's analysis. This third prong of the bankruptcy process construct involves the spectrum of issues, actions, proceedings, administrative matters within the arena that can be labeled the "discharge/dischargeability of the debtor and actions against the debtor." The weight of authority is satisfied that there is no jury trial right within this prong, even as regards the issuance of money judgments against the debtor which are not necessarily filed as claims against the bankruptcy estate. See, e.g., *Matter of Walker*, 51 F.3d 562 (5th Cir.1995) (Court determines that bankruptcy court may enter final judgment for attorney fees on non-dischargeable debt); *Matter of Maurice*, 21 F.3d 767 (7th Cir.1994); *In re*

*McLaren*, 3 F.3d 958 (6th Cir.1993); *In re Hallahan*, 936 F.2d 1496 (7th Cir.1991); *Matter of Copeland*, 412 F.Supp. 949 (D.Del.1976); *In re Hooper*, 112 B.R. 1009 (9th Cir. BAP 1990); *In re Thrall*, 196 B.R. 959 (Bankr.D.Colo.1996).

**18.** Ordinarily, a Chapter 7 debtor would qualify as a party in interest only upon a showing that the estate contained surplus funds. *In re George Schumann Tire and Battery Company*, 145 B.R. 104, 107 (Bankr.M.D.Fla.1992). However, CPC has alleged that Schott should have abandoned the estate's claim to the property. If Schott had done so, CPC would have benefitted directly, and is thus a party in interest on the issue of abandonment.

the trustee's duties. However, the Code is silent on the issue, except that through § 323(b), it is clear that "The trustee in a case under this title has capacity to sue and be sued." (Also, a court can remove a trustee for cause, § 324(a), and a court can limit the trustee's compensation, § 326(d). Nothing in the Code indicates whether a court may impose monetary liability on the trustee for his actions, or whether such liability, if it exists, will result in a claim against the estate or a claim against the trustee personally.) What we glean from § 323(b) is that the trustee, as representative of the estate, has the capacity to be named in suits asserting claims against the estate. Is there more?

The court must turn to the jurisprudence for guidance. Several cases have held that a trustee is a fiduciary representative of the bankruptcy estate and owes the concomitant obligations of loyalty and due care to the estate and its beneficiaries. However, as Justice Frankfurter observed:

> But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?

*SEC v. Chenery Corp.*, 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943). The most significant question for present purposes (determining whether this suit is, in effect, a suit against the bankruptcy trustee) is the last: What are the consequences of a bankruptcy trustee's deviation from duty? [19]

As the following analysis of the relevant jurisprudence will show, there is no generally accepted answer. The question before the court is: if Schott is found to have breached a fiduciary duty to CPC, will he be liable personally or as a representative of the estate, or both? Some courts hold that a bankruptcy trustee is personally liable for all acts of mismanagement or breach of fiduciary duty. Others hold that the trustee is personally liable only for intentional acts of wrongdoing, and that he is liable "in his official capacity" for negligent breaches of duty. As mentioned, the complaint as amended alleges wilful or intentional breaches of fiduciary duty, but experience tells us that if Schott could be liable for negligent breaches, CPC would take it (there is presently no deadline order which would preclude further amendment of the complaint, if such would be necessary). If the phrase "in his official capacity" carries the same meaning as "in a representative capacity," then this second line of cases stands for the proposition that a claim against a bankruptcy trustee for a negligent breach of his fiduciary duty is a claim against the estate.[20] Such a result would lead to a finding that CPC's lawsuit falls squarely upon the ground already plowed by the Supreme Court and would require a conclusion that CPC was not entitled to a trial by jury.

Before moving forward, let us take a couple of steps back. We will be discussing the cases involving trustee liability, including those that make the personal liability/liability in an official capacity distinction. Prior to discussing the "liability only in an official capacity for negligent acts" cases, it was thought that it might be beneficial to know what the term "liability in an official capacity" means.

We read §§ 323(a) and (b) as a whole to mean that the trustee has the capacity to be sued as *the* representative of the bankruptcy

---

**19.** This question may prove of significance to the merits of the plaintiff's claims. Does a Chapter 7 trustee owe a fiduciary duty to the debtor (and/or, in the corporate Chapter 7 case, the owners of the debtor)? Is the answer to this question dependant upon the context within which it is asked? For example, does it matter if the estate is insolvent? Is the scope of the duty (if any) related to or affected by the extent to which the party claiming breach had the authority or ability to provoke the same result that the trustee failed to obtain (say by seeking to compel abandonment pursuant to § 554(b))? As noted, we leave these questions, since they involve the merits, for another day. However, integral to this Court's thinking is the extent to which these questions, when folded together, implicate the equitable nature of the particular action raised by this complaint.

**20.** Such a result would, as explained above, lead to the conclusion that CPC cannot have a jury trial because a claim against the estate implicates the first prong of the bankruptcy process.

estate created under the Bankruptcy Code by the filing of a bankruptcy case. As mentioned, § 704 sets forth, generally, the universe of trustee duties which can be described essentially as Bankruptcy Estate Administration. (See § 704(9)). At first blush, then, the phrase "liability in an official capacity" is descriptive of liability of the bankruptcy estate for actions of the bankruptcy estate, which can be established by means of assertion of a claim against the representative of the estate, the one with capacity to be sued. Therefore, we understand the phrases "liability in an official capacity" or "action against the trustee in his official capacity" to mean "actions against the bankruptcy estate through the trustee." Also, we understand the phrases to be exclusive of actions against, and liability of, a trustee personally or individually. For guidance of our understanding, we resort to the mines possessing the richest veins of authority—the civil rights arena. There we find immeasurable pronouncements on this subject (usually within the context of actions seeking to tag the bigger repository of money, i.e. the state, municipality, or employer). Over and over the U.S. Supreme Court has asserted that "a suit against a state official in his or her official capacity is not a suit against the official, but rather is a suit against the official's office. As such, it is no different from a suit against the state itself." *Mack v. United States*, —— U.S. ——, ——, 117 S.Ct. 2365, 2382, 138 L.Ed.2d 914 (1997), citing *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). In *Kentucky v. Graham,* the Court stated:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law ... Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the entity itself.

*Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (citations and internal quotation marks omitted). See also, *Huckabay v. Moore,* 137 F.3d 871 (5th Cir.1998) (Per a suit against a county commissioner as employer, the court says "Because the wrongful acts are performed within his official capacity, any recovery against that person must be against him in that capacity, not individually"). For examples of suits against bankruptcy trustees or trustee-types, see *Barton v. Barbour,* 104 U.S. (14 Otto) 126, 26 L.Ed. 672 (1881), in which a court-appointed receiver was sued for damages allegedly suffered by a passenger while riding a railroad car in operation as part of ongoing railroad operations, while the railroad company (and its assets) was in receivership. Although the question was whether a court of another state (than the one appointing the receiver) had jurisdiction over a suit at law seeking recovery for the negligent acts of administration of the property subject to the receivership, the Court does opine concerning the difference between an official capacity claim and a personal suit against the receiver. In sum, the Court sees that "the claim of the plaintiff, which is against the receiver for personal injury sustained by her while traveling on the railroad managed by him, stands on precisely the same footing as any of the expenses incurred in the execution of the trust, and must be adjusted and satisfied in the same way." *Id.,* 104 U.S. at 131. As distinguished from this official capacity claim, "if one claiming that the assignee has wrongfully taken possession of his property as property of the bankrupt, he is entitled to sue him in his private capacity as a wrongdoer in an action at law for its recovery." *Id.,* at 134. Suits in an official capacity, then, generate claims against the res of the receiver (or trustee or assignee in bankruptcy) and are to be settled as such; claims against the receiver for ultra vires acts, or acts outside the scope of administration of the res, do not

result in claims against the res, but can be asserted against the representative individually. Also, in *Reading v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), an action against a receiver of a corporation in an arrangement for negligence of the receiver and those in his employ, while acting within the scope of his authority (in allowing a building—the only asset of the debtor—to burn down, uninsured) was, within the subsequent liquidation, a claim for costs and expenses of the administration of the res, entitled to priority over the prepetition claims.

The United States Supreme Court, in *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951), issued what the dissent characterized as a "rule of trustee liability [that] did not exist before today, as is shown by the fact that no statute or case is cited in support of the court's decision." 341 U.S. at 275, 71 S.Ct. at 684. In so doing, the Court issued its last discourse (to date) on the scope of a trustee's liability for acts done while administering a bankruptcy estate. The opinion has engendered much confusion concerning the extent to which a claim against a trustee is, in fact, a claim against the estate, or, put another way, the extent to which a trustee can be personally liable for acts done while acting as trustee.

Darrow was the reorganization trustee for two trusts. He hired two trust insiders, Kulp and Johnson, to help him reorganize the businesses. One of Darrow's reorganization strategies was to buy up the outstanding bonds of various subsidiary companies at a substantial discount. One of the terms of the agreement by which Kulp and Johnson agreed to work for him was that they would be allowed to conduct trade in these bonds on their own behalf. This fact was not disclosed to the court or to the trustee's counsel. Kulp and Johnson often bought bonds from holders who had come to sell them to Darrow and would later sell the bonds to Darrow at a substantial profit. After several years, the SEC intervened in the case and demanded an investigation into Darrow's activities as trustee. Darrow resigned and filed his final reports and accounts. Mosser, the successor trustee, objected to approval of those reports. He claimed that Darrow's tolerance of the insiders' activities had cost the estate $43,000 and that Darrow should be held personally liable for the lost income. 341 U.S. at 268–70, 71 S.Ct. at 681. The Supreme Court held Darrow personally liable to the estate for the income diverted to the insiders, despite the fact that he had not benefitted from their actions. *Id.*, at 275, 71 S.Ct. at 684.

The Court began its analysis by observing that a trustee is a representative of the court and must be held to a strict standard. *Id.*, at 271, 71 S.Ct. at 682. Further, because self-interests are "always corrupting" (though not always corrupt), "These strict prohibitions would serve little purpose if the trustee were free to authorize others to do what he is forbidden." 341 U.S. at 271, 71 S.Ct. at 682. Upon this observation, the Court concludes: "We think that which the trustee had no right to do he had no right to authorize, and that the transactions were as forbidden for benefit of others as they would have been on behalf of the trustee himself." *Id.*, at 272, 71 S.Ct. at 682. As noted above, the Court fashions a remedy for such actions, though the trustee himself profited not at all, in great part to forestall future conduct such as was before it. "The most effective sanction for good administration is personal liability for the consequences of forbidden acts, and there are ways by which a trustee can effectively protect himself against personal liability." *Id.*, at 274, 71 S.Ct. at 683. ("A further remedy for limiting, if not avoiding personal liability is to account at prompt intervals, which puts upon objectors the burden of raising their objections." *Id.*)

By its opinion the *Mosser* Court reversed the Court of Appeals, which had concluded that no personal liability (or surcharge against Darrow) should attach. Crucial to unraveling the confusion that has ensued from the opinion is to understand just what the Supreme Court reversed. In its opinion, *Darrow v. Mosser*, 184 F.2d 1 (7th Cir.1950), the Court of Appeals cited numerous treatises for the proposition that a trustee who uses due diligence or reasonable care in the selection of employees is not liable to beneficiaries for the negligence or dishonesty of the employees if reasonably prudent in the

supervision of them. 184 F.2d at 7. As well, Darrow offered numerous bankruptcy cases supporting the proposition that if the trustee is not derelict in the hiring, a surcharge will not be imposed if the employees turn out bad. The generalized conclusion of the authority offered by the trustee is that if a trustee acts within the scope of his authority, he is not chargeable with losses to the estate through the acts of others, and he is personally chargeable only if guilty of personal fault in the nature of fraud or "supine negligence equivalent to fraud." 184 F.2d at 8–9. (The Court points out that the reference to "supine negligence equivalent to fraud" is a reference to *Taylor v. Benham*, 46 U.S. (5 How.) 233, 12 L.Ed. 130 (1847). In that case the Supreme Court says, in connection with a claim against an executor for losses over the sums received by the executor, "When a trustee is liable for more, it must be, in the language of the books, 'in cases of very supine negligence or wilful default.'" 46 U.S. at 275.)

The Court of Appeals concludes that simple negligence is not sufficient to establish that a trustee sufficiently breaches his obligation of due diligence and care in the administration of the estate to suffer personal liability, and if anything, simple negligence is all that had been established. Therefore, the surcharge issued by the lower court was reversed. Now, two things in addition shed light. First, the Court does not suggest that Darrow was not negligent, and in fact points out that a certain portion of the successor trustee's claim was reserved for future proceedings. In this regard the court notes that Darrow's "failure to file reports showed a woeful neglect of duty." 184 F.2d at 10. Not subject to the successor trustee's cross-appeal was the request to impress upon certain assets a resulting trust arising from these acts of negligence, and as well to assess additional surcharge. The resulting trust request is tantamount to a claim that the estate is to be maintained and made whole by the imposition of a resulting trust. As well, there is the possibility of other surcharge (maybe woeful negligence is equivalent to supine negligence equivalent to fraud). Second, the Court predicts the Supreme Court's reversal of its opinion through a reference to

*Magruder v. Drury*, 235 U.S. 106, 35 S.Ct. 77, 59 L.Ed. 151 (1914), a case involving a trustee whose firm acted as broker of a sale of trust securities, earning a profit on the sale. Though guilty of no "wrongdoing" the trustee was required to return the profit he had earned as a result of the general prohibition upon a trustee profiting from the trust's business. Though this conclusion is seen as being of no import, the Court also notes that the argument that "he should be surcharged for allowing his agents and employees to make profits he could not himself make in equity," 184 F.2d at 10, is devoid of authority and is to be dismissed. (As we have seen and will see, the absence of authority was no hurdle for the Supreme Court.)

Darrow's argument, based upon the Court of Appeals' decision, was that while a bankruptcy trustee could be held liable only upon a showing of fraud or supine negligence, personal liability here would require the conclusion that simple negligence would suffice for such a surcharge. The Supreme Court disagreed:

> We see no room for the operation of principles of negligence in a case in which conduct has been knowingly authorized … The question whether he was negligent in not making detailed inquiries into their operations is unimportant, because he had given a blanket authority for the operations. The liability here is not created by a failure to detect defalcations, in which case negligence might be required to surcharge the trustee, but is a case of a willful and deliberate setting up of an interest in employees adverse to that of the trust.

341 U.S. at 272, 71 S.Ct. at 682. What is the Supreme Court saying in this last sentence? Some of it is clear. If a trustee intentionally constructs, either personally or by means of employees, a set-up by which he or his employees can profit from trust business, the trustee will be surcharged, personally, to return the profits to the estate. However, what is not clear is whether the Court is also embracing personal liability arising from plain garden-variety negligence. There can be two interpretations: (i) in issues involving failure to detect defalcations, it is possible to assess the trustee personally for the damage,

or return of profits, upon a showing that simple negligence caused harm; (ii) in light of prior jurisprudence protecting the trustee personally unless guilty of fraud or supine negligence, if what was before the court (as the Court of Appeals thought) was failure to detect defalcations, the trustee might be correct in his argument that to surcharge personally, the court would have to say simple negligence is now sufficient (but because that is not what the court is dealing with, the question is moot). As we shall see, the *Mosser* case and issues therein, never again revisited by the Supreme Court, have generated a variety of views among the circuits facing questions of trustee liability. Although the circuit courts that have interpreted *Mosser* fail to agree on its meaning,[21] they all agree on two points. First, the standard of care that *Mosser* imposes on a bankruptcy trustee is that of an ordinarily prudent man in the conduct of his private affairs under similar circumstances and with a similar object in view. Second, although a mistake of judgment is not a basis for liability, a failure to meet the standard of care will subject the trustee to liability of some kind. *In re Cochise College Park, Inc.*, 703 F.2d 1339 (9th Cir.1983).

There is no consensus on the issue that is most important for our purposes: whether the trustee's liability is representative, and therefore a claim against the bankruptcy estate, or purely personal. Some courts hold that a bankruptcy trustee is personally liable only for willful and deliberate violations of the standard of care. If the trustee is merely negligent, then according to these cases, he will be liable in his "official capacity." *Sherr v. Winkler*, 552 F.2d 1367 (10th Cir. 1977). Such liability would result in a claim against the estate. Other courts have found that a trustee is personally liable for negligent acts as well as wilful or intentional ones.[22] *Cochise, supra.* If the trustee is personally liable for all breaches of duty, then no such breach will result in a claim

against the estate, and the first prong of the equitable bankruptcy process is not implicated in an action against a trustee for breach of his fiduciary duty to the estate.

The line of cases denying personal liability for negligent acts begins with *Sherr, supra.* The facts of that case may be stated as follows: In 1968, Sierra Trading Company (Sierra) and American Petrofina Corp. (Petrofina) each owned 50% interests in certain Wyoming oil and gas leases. In December of that year, Sierra assigned 75% of its interest to Rapp Oil Company. Rapp then assigned its rights to Sherr and Rubin, the plaintiffs (Sherr). After Sierra filed Chapter X, Winkler was appointed as reorganization trustee. Winkler was not an attorney, but was "an independent oil operator with much experience in drilling and production." *Sherr,* 552 F.2d at 1371. Winkler was unaware that Sherr had any interest in the revenues from the leases. He authorized his attorney to conduct a title search to determine all ownership interests, but the attorney's report made no mention of Sherr's interest. On October 9, 1970, Winkler sought the reorganization court's permission to use proceeds received from Petrofina to operate, maintain, and preserve assets of the estate for a period of 90 days. Sherr appeared at the hearing, but the court held that he had no standing to lodge an objection. The court granted Winkler's motion, and eventually extended the amount of time Winkler could use the funds to January 15, 1972. After extensive litigation, it was determined that the plaintiffs owned roughly $150,000 of the money that Winkler had been using. Once they recovered this money, they sued Winkler for conversion, attorney fees, and punitive damages. *Id.,* at 1369–72.

The trial court found for Winkler, holding that he had acted pursuant to court order; that his actions did not constitute negligence, bad faith, or reckless disregard of the plain-

---

**21.** Compare *In re Cochise College Park, Inc.,* 703 F.2d 1339 (9th Cir.1983) (favoring the first interpretation of *Mosser*) with *Sherr v. Winkler,* 552 F.2d 1367 (10th Cir.1977) (favoring the second).

**22.** All of these cases hold that a bankruptcy trustee is personally liable for willful or intentional

breaches of duty. Therefore, to the extent that CPC's claim against Schott is based on Schott's intentional misconduct, it is not a claim against the estate and therefore does not involve the first prong of the bankruptcy process.

tiffs' rights; and that he had not violated his fiduciary duties to the estate. The Tenth Circuit affirmed. ·It observed that the standard applicable to surcharge of a bankruptcy trustee is negligence, citing *Mosser, supra.* The court also cited *Mosser* for the following rules on trustee liability: "a trustee or receiver in bankruptcy is (a) not liable, in any manner, for mistake in judgment where discretion is allowed, (b) liable personally only for acts determined to be wilful and deliberate in violation of his duties, and (c) liable, in his official capacity, for acts of negligence." *Id.,* at 1375. The plaintiff argued that *Mosser* created a broad rule of personal liability for a bankruptcy trustee, but the court disagreed. It quoted *Mosser*'s statement that "The liability here is not created by a failure to detect defalcations, in which case negligence might be required to surcharge the trustee, but is a case of a willful and deliberate setting up of an interest in employees adverse to that of the trust," *Mosser,* 341 U.S. at 272, 71 S.Ct. at 682, and stated: "There the court held that a reorganization trustee would not be liable personally except for willful and deliberate acts....A trustee in bankruptcy may be held liable in his official capacity and thus surcharged if he fails to exercise that degree of care required of an ordinarily prudent person." *Sherr,* 552 F.2d at 1375. The court concluded by affirming the trial court's finding that Winkler had committed neither negligence nor a willful and deliberate act and that he wouldn't be liable under any standard. *Id.,* at 1376.

The Fourth,[23] Sixth,[24] and Seventh[25] Circuits have either followed *Sherr* or cited it favorably. The Second and Ninth Circuits have not. *In re Cochise College Park, Inc.,* 703 F.2d 1339 (9th Cir.1983), is a Ninth Circuit case in which the court rejects *Sherr,* stating that a trustee "is subject to personal liability for not only intentional but also negligent violations of duties imposed upon him by law." *Id.* at 1357. The *Cochise* court criticized *Sherr*'s statement that to surcharge a trustee is to hold him liable in his official capacity:

> Given that the "surcharge" itself means to impose "personal liability on a fiduciary for wilful or negligent misconduct in the administration of his fiduciary duties", we find this interpretation to be incorrect. Properly construed, the language quoted from *Mosser* indicates merely that the sort of personal liability which may be imposed on a trustee for the acts of his employees is not strict liability but rather liability depending at least on a showing of the trustee's own negligence; *Mosser* does not "hold" in any sense that personal liability does not obtain if such a showing of negligence is made.

*Id.* at 1358, n. 26. (citations omitted). See *Bennett v. Williams,* 892 F.2d 822 (9th Cir. 1989); *In re Rigden,* 795 F.2d 727 (9th Cir. 1986).

The Second Circuit has also found that a trustee was personally liable for negligent acts, upholding a surcharge of a Chapter XIII trustee that imposed personal liability on him for failure to monitor the debtors' performance of their wage-earner plan. *In re Gorski,* 766 F.2d 723 (2nd Cir.1985). The lower court had found that the trustee's failure to carry out his obligations constituted "a material breach and default of his fiduciary duties and ... a negligent disregard of the rights and best interest of creditors." *Id.* at 725. The issue on appeal was whether surcharge was appropriate. The court cited *Mosser* and *Cochise* for the proposition that: "In the usual case, a surcharge is imposed on the fiduciary in the amount of the actual or estimated financial harm suffered by either the creditors or the estate and is payable accordingly." *Id.* at 727. Consequently, it affirmed the order surcharging the trustee, but reversed that part of the order which required that he pay the surcharge to the U.S. Treasury. The court said: "There is no

---

23. *In re Hutchinson,* 5 F.3d 750 (4th Cir.1993); *Turshen v. Chapman,* 823 F.2d 836 (4th Cir. 1987); *Yadkin Valley Bank & Trust Co. v. McGee,* 819 F.2d 74 (4th Cir.1987); *United States for the Use and Benefit of Julien P. Benjamin Equipment Co. v. Sapp,* 641 F.2d 182 (4th Cir.1981).

24. *Ford Motor Credit Co. v. Weaver,* 680 F.2d 451 (6th Cir.1982). The Sixth Circuit also cited *Weaver* favorably in an unpublished opinion, *In re Slodov,* 1988 WL 62180, at *6 (6th Cir.1988).

25. *In re Chicago Pacific Corp.,* 773 F.2d 909 (7th Cir.1985).

question that a trustee in bankruptcy may be held personally liable for breach of his fiduciary duties. Such liability may attach as the result of negligent, as well as knowing or intentional, breaches." *Id.* at 727 (citations omitted).

No opinion from the Fifth Circuit, the District Court for the Middle District of Louisiana, or this Court has ever addressed the issue of whether a bankruptcy trustee is personally liable for acts of negligence. This Court must now determine whether the *Sherr* court or the *Cochise* court interpreted *Mosser* correctly. If the *Sherr* court is correct, and a bankruptcy trustee is liable in his official capacity for acts of negligence, and if CPC's claim against Schott can be construed to include allegations of negligence, then the claim is a claim against the estate. If CPC's claim is one against the estate, then the administration-of-claims-prong of the bankruptcy process is implicated, and CPC has no right to a jury trial. If, on the other hand, *Cochise* is correct, and Schott is liable in his personal capacity for acts of negligence, then administration of claims is not relevant here, and the court must go on to determine whether CPC's claim comes within the scope of the second prong of the equitable bankruptcy process, the administration of the res.

While the *Sherr* interpretation has been found persuasive by four of the six Circuit Courts of Appeals to have addressed the issue, it has also been heavily criticized. The critics claim that the case improperly differentiates between the surcharge of a trustee and personal liability. As one commentator states:

> This language is questionable, in that it tries to distinguish the surcharge of a trustee from personal liability while surcharge is in fact a means of imposing personal liability. In all the cases cited in the general discussion above concerning personal liability for loss to the estate in collection, preservation or distribution of the assets, surcharge and personal liability were synonymous.... the decision cites *Mosser v. Darrow* for the proposition that a trustee or receiver is 'liable personally only for acts determined to be wilful and deliberate in violation of his duties' and

'liable in his official capacity, for acts of negligence,' for which the trustee is surcharged. As explained earlier, *Mosser* made no such distinction. On the contrary, that case shows just the opposite, for while the trustee in *Mosser* was found personally liable for a wilful and deliberate act, the result was a surcharge of the trustee. Surcharge, in other words, was and is merely the means of imposing personal liability upon a bankruptcy trustee or receiver for loss to the estate. It is certainly not, as the *Sherr* decision states, a means of imposing liability in his 'official capacity' unless that phrase is to be given a meaning entirely opposite to which traditional definition, i.e., where the estate rather than the fiduciary is required to bear loss to the third persons ... *Sherr v. Winkler*, it seems, uses all the language pertinent to personal liability of bankruptcy officers, but the contradicting and confusing manner in which the court arranged the language gives it poor potential as a case precedent.

Tiller, Personal Liability of Trustees and Receivers in Bankruptcy, 53 Am.Bankr.L.J. 75, 99–102 (Winter 1979) (footnotes omitted).

This Court finds that the reasoning of the dictum in the *Sherr* opinion is incorrect. *Mosser* did not state that a trustee can be held personally liable **only** if he has committed a willful or deliberate breach of his fiduciary duties. *Mosser* involved a willful and deliberate breach of duty, and the court, in recognizing the fact, stated that the issue of negligence was not relevant to its case: "We see no room for the operation of the principles of negligence in a case in which conduct has been knowingly authorized." *Mosser*, 341 U.S. at 272, 71 S.Ct. at 682. The *Sherr* court somehow understood "surcharge" to be an imposition of liability in an official capacity, when it is not. Black's Law Dictionary offers the following definitions for "surcharge":

> The amount with which a court may charge a fiduciary who has breached his trust through intentional or negligent conduct. The imposition of personal liability on a fiduciary for such conduct.... The imposition of personal liability on a fiducia-

ry for wilful or negligent misconduct in the administration of his fiduciary duties.

Black's Law Dictionary 1441 (6th Deluxe ed.1990). In addition, use of the term "surcharge" only in connection with "official capacity" liability runs directly afoul of what the *Mosser* court actually did, which was to hold the trustee personally liable for the "surcharge."

That is not to say that the *Cochise* line of authority is correct. In its own way, it too has misread *Mosser.* What *Mosser* reversed was the appeals court determination that this case involved the necessity of determining whether Darrow was sufficiently negligent (supinely so) to warrant personal liability (surcharge) and the lower court's conclusion that if personal liability was to be assessed against Darrow, it would have to be upon simple negligence far below the supine negligence or intentional, bad conduct previously required, as Darrow had not (in the opinion of the Court of Appeals) been guilty of such. We think that the *Mosser* court made no determination concerning whether run-of-the-mill negligence is sufficient to constitute breach of fiduciary duty sufficient to warrant imposition of personal liability, as it dispensed with any determination regarding any level of negligence. We think it probable that the Court was addressing Darrow's claim that surcharge would require a modification of the supine negligence standard, and it was saying that if failure to detect wrongdoing was the issue, perhaps (given the profits generated for the estate and the overall apparent soundness of the business practices employed) Darrow would be right. Because it wasn't, he wasn't.

What we get from this disparate authority is that the real question is whether the trustee is personally liable for damages done to the estate. It is perhaps the posture of the claimants in the various cases that has resulted in the differing lines of analysis. Recall that the *Mosser* claim was brought by a successor trustee on behalf of the estate for damage done to the estate. The question was "To what extent will a trustee be personally liable to the estate (or creditors of the estate) if damage is done to the estate (or the interest of a creditor in that estate) as a result of his administration?" This is the question presented by *Cochise, Gorski,* etc. Either a trustee will be liable personally, or there will be no liability at all. If damage is done to the estate, then the estate cannot be held liable for that damage to its creditors (or itself).

First, assume some damage to the estate through trustee administration. Each creditor· has the same position relative to other creditors that it had before the asset in question was destroyed or the damage done. Each creditor has suffered a loss in proportion to the size of his claim. If any creditor is to receive from the estate some compensation for his loss, then that compensation must take the form of a larger share of the estate. But if one creditor gets a larger share of the now smaller estate, some other creditor (or group of creditors) must take a correspondingly smaller share. Therefore, the trustee's action in damaging the estate, if the estate was to be liable, would result in one creditor (or group of creditors) compensating another for damages that they have all suffered in proportion to their claims, while the trustee, whose action occasioned the loss, pays nothing.

If, alternatively, a court attempted to adhere to the rule that the trustee's negligence results in a claim against the estate, but also wanted to avoid the injustice of forcing some creditors to compensate others for a loss in which they were all equally blameless, the court might attempt to compensate the claimants without altering the *pro rata* distribution of the estate. How? If the claim for negligence is a claim against the estate, and each creditor is to share in the compensation according to the size of its claim against the estate, then each creditor will receive an additional claim against the estate that corresponds exactly to the creditor's pre-existing claim. Since each creditor will have a claim that is larger, but larger by the same proportion that every other claim is larger, the increase in claims will alter nothing, and each creditor will have the same *pro rata* share of the estate that it would have received prior to the trustee's negligence. The only difference is that, as a result of the loss to the estate, the estate is less valuable, so each

creditor will bear the loss in proportion to the size of its claim.

We see, therefore, that the *Sherr* proposal of official capacity liability, as it would be the same thing as estate liability, cannot exist with a claim against a trustee for damage done to the estate. Either the trustee is liable or he is not. If he is, then the estate derives the recovery from the trustee's personal liability/surcharge; if he is not, then notwithstanding actual damage to the estate, his level of problematic conduct is insufficient to warrant imposition of personal liability.

If *Sherr* is seen in this light, it makes at least some sense. Recall that the plaintiff was a third party who did not hold a prepetition claim against the estate, who was not a party who was dependent upon estate administration. In fact, the plaintiff alleged the opposite—"You are using my property; give it back. By the way, I want attorney fees, etc." Clearly, the claim alleges that the trustee, while trustee, caused damage but (and here is the difference from *Mosser*) caused damage to an otherwise non-party, not to any estate property interests. The initial question, therefore, is not to what extent has the estate been damaged, but to what extent has the plaintiff been damaged by the trustee and his estate? What we have is two parties out in the world colliding. Is anyone hurt? If so, who pays? In this context the trustee is acting as trustee, unless the action is undertaken within the trustee's other life, or outside the scope of his authority as trustee (representative of the estate). To this outsider this trustee is nothing more than the person through whom the estate acts. Therefore, it is utterly appropriate to consider official capacity versus personal capacity questions. However, it is not correct to tie this analysis back to *Mosser*. We see the *Sherr* case as analogous to an action against a corporate officer, the individual county commissioner, etc. To what extent will the conduct allow the claimant to place its grabbing hands in the individual's pocket as opposed to that of the entity being represented by the individual's action? With this focus, the official capacity question (*vis a vis* negligent conduct within the scope of a trustee's representation) is a real one, and

the answer (without consulting *Mosser*, which is utterly inapplicable) is probably not too far off from what the *Sherr* court said it was.

Further support for the proposition that liability in an official capacity does play an important role for bankruptcy trustees comes from another Supreme Court case, *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). In 1962, the I.J. Knight Realty Company filed a Chapter XI petition under the Bankruptcy Act. The court appointed Brown to be the receiver, and authorized him to conduct the company's business, which consisted of leasing space in a building in Philadelphia. In 1963 the entire building was destroyed by a fire, which spread to adjoining buildings and caused substantial damage. One hundred forty-seven claims, totaling three and a half million dollars, were filed against the estate as a result of the fire. The Supreme Court held that the post-petition tort claims were valid claims against the estate, and further, that these claims were entitled to priority as administrative expenses. According to Justice Harlan, author of the opinion, the rationale behind this result was that the insolvent corporation was allowed to enter Chapter XI to benefit the prepetition creditors, while Reading Co., along with the other fire claimants, "had an insolvent business thrust upon it by operation of law." 391 U.S. at 478, 88 S.Ct. at 1763.

For our purposes, the important thing to note about the opinion is the result rather than the rationale. The defendant in the case was Brown, the trustee. But the fire claimants were not attempting to recover against Brown personally. Rather, they were attempting to get the court to recognize their claims against the estate. Brown, as the legal representative of the Knight Realty Company, was sued in his representative, or official, capacity, because an employee of the Knight Realty Company negligently started the fire that caused the damage. It is unlikely that the fire claimants could have recovered against Brown personally unless he was somehow personally responsible for starting the fire.

What we have in *Reading v. Brown*, then, is the end result of an official capacity suit for the negligence of the estate, assessed through the representative (actor) of the estate, which occurred as a result of the trustee acting within his official capacity. *Mosser* is inapplicable, because *vis a vis* the injured parties, it cannot be said that the damage was caused by a breach of fiduciary duty. In fact, the claimants, spending the time and money they did, recognized this naturally. The reasoning of *Sherr* applied to the facts of *Reading Co. v. Brown* (with one difference, a personal claim against the trustee as opposed to a claim against the estate seeking administrative priority) generates a correct result. The claim is one for negligence-caused property damage. The trustee was acting within the scope of his authority. The claim can only be assessed against the trustee in his official capacity as a claim against the estate.

However, we can use *Reading v. Brown* to move into an arena dealt with by *Mosser*. What about the question of whether the pre-petition creditors have a claim against the trustee, personally, for damage done to the estate—no insurance, asset destroyed, administrative claims result which further dilute the creditors' claim values. Now we see that talk of "official capacity" would be misplaced. Remember, Darrow acted within his "official capacity"—he hired employees. The *Reading v. Brown* trustee managed the building. The official capacity claim, though, has no role to play here, as the damage caused to the estate cannot be paid by the estate; it can only be paid by a trustee if the trustee's conduct rises to the level of misconduct sufficient to constitute a breach of fiduciary duty. Whereas simple negligence will obligate an estate to third parties (as it did in *Reading v. Brown*), the question of whether simple negligence will obligate a trustee to the estate for damage caused to the estate, we think, is not answered by *Mosser v. Darrow*. In fact, in refusing to discuss negligence, the court (breaking new ground) does not opine one way or the other. Authority other than *Mosser*, therefore, must be used to bind a trustee, personally, for negligent damage to an estate.

Back to our case. We see that the claim, diminution in the value of an estate (or formerly estate) asset, is one for damage to the estate. Therefore, though it is the debtor and its owner asserting the claim, there is no analytical avenue by which an official capacity claim can be asserted. If Schott did wrong, he did it to the estate. As such, while he was in fact acting within his official capacity as trustee (the trustee can administer or abandon, etc.), the estate allegedly damaged (or the debtor's interest in property worthless to the estate made even more worthless by prescription) cannot owe itself. What we have here is a personal claim against the trustee, so that even if the nature of the factual allegations would change by amendment, to allege negligence, there could be no "official capacity liability." It simply is not available to a trustee in response to a claim by, for, and on the basis of the estate.

In this case, CPC alleges that Schott damaged the estate through his failure to pursue the antitrust claim. Alternatively, he damaged the debtor through his failure to abandon the claim so that the debtor could bring the claim. Either way, if Schott is liable, it is because he failed to conduct the business of the bankruptcy trustee properly and violated his duties under the Bankruptcy Code. This is not a case involving a third party with a post-petition tort or contract claim. If Schott is liable, then it is in his personal capacity. CPC's claim is not a claim against the estate, and the administration-of-claims-prong of the equitable bankruptcy process is therefore not implicated here.

### Does CPC's claim sufficiently implicate the Trustee's duties to fall within the Administration of the Res Prong?

Before concluding that CPC's action is a "suit at common law" within the meaning of the Seventh Amendment, the Court must also examine Prong Two of the bankruptcy process to determine whether the action against the trustee implicates that aspect of the court's equitable jurisdiction. Prong Two involves the administration and distribution of the res. Though the cited Supreme Court authority is specifically grounded in the Claims Administration Prong, this Ad-

ministrative Res Prong is just as necessary to the bankruptcy process as Prong One (it simply has not gotten the media attention that has been lavished upon Prong One). While Prong One provides the framework by which the trustee determines who has a valid claim against the res, Prong Two provides the mechanism by which the trustee ensures that there is a res to be distributed and that it maintains its value pending distribution. If CPC's claim sufficiently involves administration of the res, then it falls within the traditional, pre-1978 scope of the bankruptcy process. If that is the case, the Seventh Amendment is not implicated because CPC's claim is equitable rather than legal.

Under the Bankruptcy Code, the person responsible for administration of the estate is the trustee. §§ 323(a), 704. He must "collect and reduce to money the property of the estate." § 704(1). He must close the estate "as expeditiously as is compatible with the best interests of parties in interest." § 704(1).

The decision of whether to abandon property of the estate is intricately bound up with the equitable administration process of maximizing return to creditors. In fact, courts of equity created the abandonment power in the eighteenth and nineteenth centuries in order to assist the assignee in bankruptcy with the administration of the bankrupt estate. Under the old bankruptcy procedures, title to all of the bankrupt's property vested in the assignee, either through court order or through operation of law. The assignee then administered the property on behalf of the bankrupt's creditors. Quickly, courts realized that some items served as a burden on the assignee and benefitted nobody. They then developed the equitable doctrine of abandonment, which entitled the assignee to relinquish his claim to certain property, subject to the objection of creditors and to court approval.

> But though the legal title passes to the assignee, he is not bound, said Judge Ware, to take possession of the property. Leasehold estates pass to the assignee under the English bankrupt laws, but the assignee is not bound to take the lease and charge the estate with the payment of the rent, as the rent may be greater than the value of the lease, and thus the estate may be burdened instead of being benefited, and in such a case the claim may be abandoned by the assignee ... *Copeland v. Stephens*, 1 Barn. & Ald. 603; *Fowler v. Down*, 1 Bos. & P. 44.

*Amory v. Lawrence*, 1 F.Cas. 778, 783 (C.C.D.Mass.1872).[26]

Abandonment has grown increasingly important as the availability of bankruptcy relief has increased and as the focus of the law has shifted away from maximization of return to creditors who have filed claims and toward debtor relief. In most modern cases, the trustee determines that the cost of gathering, liquidating, and distributing estate property would be greater than any possible return to creditors.[27] Consequently, in most cases the

---

**26.** See also, *First National Bank of Jacksboro v. Lasater*, 196 U.S. 115, 25 S.Ct. 206, 49 L.Ed. 408 (1905); *Dushane v. Beall*, 161 U.S. 513, 16 S.Ct. 637, 40 L.Ed. 791 (1896); *Sessions v. Romadka*, 145 U.S. 29, 12 S.Ct. 799, 36 L.Ed. 609 (1892); *Sparhawk v. Yerkes*, 142 U.S. 1, 12 S.Ct. 104, 35 L.Ed. 915 (1891); *American File Co. v. Garrett*, 110 U.S. 288, 4 S.Ct. 90, 28 L.Ed. 149 (1884); *Glenny v. Langdon*, 98 U.S. (8 Otto) 20, 25 L.Ed. 43 (1878); *Quinn v. Gardner*, 32 F.2d 772 (8th Cir.1929); *In re Malcom*, 48 F.Supp. 675 (E.D.Ill.1943). Other cases mentioning the trustee's equitable power to abandon burdensome property include *South Staffordshire R. Co. v. Burnside*, 5 Exch. 129; *Ex parte Davis*, 3 Ch. Div. 463; *Furdonjee's Case*, 3 Ch. Div. 268.

**27.** In fact, Rule 2002(e), Federal Rules of Bankruptcy Procedure, provides:

> In a Chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims.

Only a tiny minority of bankruptcy courts (in fact, a minority of one—this one) opens cases as though assets may be available; the bulk of courts (by order, local rule, or administrative policy) assumes that there will be no assets to administer and opens all Chapter 7 cases as cases falling under Rule 2002(e), notwithstanding that the rule seems to require a preliminary analysis of the schedules before the notice of no dividend. Of course, opening a case as an asset case and then issuing a Notice of No Dividend, while seemingly required, would be administratively prohibitive.

trustee does little more (formally) than to file some type of report of no distribution, which after the entry of the debtor's discharge, causes the case to be closed.[28] Once the case is closed, all scheduled assets are automatically abandoned unless the court orders otherwise. § 554(c). Therefore, abandonment of all estate property occurs as a matter of law in the vast majority of bankruptcy cases.

What has developed, then, is a nationwide proclivity for abandonment by operation of law, coupled with immediate (within 130 days) closure of bankruptcy cases. It is thought (and we know this is anecdotal) that nationwide approximately 98% of all Chapter 7 cases are closed without administration of assets. Therefore, modern bankruptcy practice in the Chapter 7 arena has evolved into a mass legal abandonment, with the claims prong of the bankruptcy process, on a wide scale, receding into near-irrelevance. If a trustee determines that there are sufficient assets in a case to make administration of the estate cost-effective, the trustee must then determine the best way to maximize the return to creditors. One way the trustee can achieve this objective is through invocation of his power to abandon burdensome or useless property of the estate. § 554.[29] (In fact, abandonment could be used by the trustee as a component of the decision-making process, by carving out assets that, if held onto, might devalue others.) If the trustee elects to abandon specific assets of the estate, then those assets will not be liquidated and no proceeds from them will be distributed to creditors. Unlike the preference action at issue in *Schoenthal*, the power to abandon estate property has historically constituted an integral part of the bankruptcy process; it was created centuries ago by courts of equity as a tool to assist bankruptcy trustees, and it occurs in almost every Chapter 7 case. In fact, "abandoning property of the estate" has no meaning in any context other than a bankruptcy case.

When a trustee abandons property of an estate, ownership of that property vests once again in the debtor. Since a debtor usually gets a discharge even when the trustee administers nothing,[30] abandonment operates as a distribution to the debtor of whatever portion of the estate is abandoned, free of any associated claims (other than, of course, lien claims). Consequently, § 554 places limitations and safeguards on the trustee's ability to abandon property of the estate. A trustee can only abandon property of the estate if he determines that the property is burdensome or of inconsequential value[31]

28. The CPC bankruptcy case was such a case. No distribution to creditors was ever made. However, no discharge was entered because Carter Paper is a corporation. This presents an interesting dilemma for CPC in the current proceeding. If the claim was worth pursuing, Schott could not have abandoned it, and even if he had, any recovery by CPC would have been reached by CPC's creditors. If it wasn't worth pursuing, CPC has suffered no damage. Frank Carter, the owner and operator of CPC, may have been able to bring an action on his own behalf. If he had recovered individually, CPC's creditors would have been unable to reach the recovery. Of course, Carter was not a debtor, and any individual claim he had never became part of the bankruptcy estate. Since it was never part of the estate, Carter could have filed his own action at any time. Therefore, it appears that CPC is arguing that Schott is liable because he failed to do something—abandon a valuable asset—that he had no legal right to do. At this preliminary stage, CPC has not had the opportunity to resolve this dilemma for the Court, but the explanation is anticipated.

29. The abandonment section (we guess we forgot to quote it earlier) reads:

§ 554. Abandonment of property of the estate
(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
(b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
(c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.
(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.

30. Unless the debtor is a corporation, as in this case.

31. The Supreme Court has created another limitation on the power of abandonment. In *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106

and can only do so after notice and opportunity to be heard is given to all creditors and parties in interest. See Bankruptcy Rule 6007. The estate has, therefore, the procedural safeguard of the creditors and parties in interest possessing the power to object to a proposed abandonment if they think the trustee is incorrect in his assessment of the asset's value. Additionally, as provided in § 554(b) and Bankruptcy Rule 6007(b), parties in interest can ask the bankruptcy court to order the trustee to abandon property that should be abandoned under the "burdensome or of inconsequential value" standard. See *In re Irwin Hyman*, 123 B.R. 342 (9th Cir. BAP 1991) ("If a debtor does become concerned that a trustee may act in dereliction of duty and not liquidate particular property within a reasonable time, the debtor may force the issue by requesting that the trustee abandon the property pursuant to § 554(b)").

Clearly, a determination whether to abandon property of the estate goes to the very heart of the bankruptcy process. It requires the trustee to notify all creditors so that they can object if they believe their interests are not being protected. It requires a hearing before the bankruptcy court if anyone objects to the trustee's proposal. It requires the

trustee to determine the size of the estate, the amount of claims against the estate, and the relative value of the particular asset in question. As stated above, the bankruptcy process involves two steps: the determination of the validity, nature, and extent of each creditor's claim and the maintenance and administration of the estate pending distribution. The decision to abandon property of the estate constitutes an integral part of the trustee's second task: the maintenance and administration of the res. In maintaining and administering the res, the trustee has an obligation to maximize the value of the assets available for distribution (number four in the Court's list of components of Prong Two of the bankruptcy process: administration of the res). This obligation includes a fiduciary duty to the estate to rid the estate of any property that operates as a net reduction in the value of the res.[32] It is apparent that a claim involving a trustee's failure to timely abandon property of the estate implicates the trustee's duty to maximize the value of the assets of the estate, a component part of the administration of the bankruptcy estate, which is, in turn, an integral part of the equitable bankruptcy process.[33]

S.Ct. 755, 88 L.Ed.2d 859 (1986), the Court held that a bankruptcy trustee could not abandon estate property "in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.*, at 507, 106 S.Ct. at 762.

**32.** While the fiduciary duty to creditors is clear, the duty to CPC is less clear. Before property can properly be abandoned, the trustee must determine that it is burdensome or worthless to the estate. If it is burdensome or worthless, then it has a negative value, or at best no value, to the estate, and the trustee is maximizing the value of the estate by dumping it. The Court is not at all certain that the fiduciary duty to the creditors to rid the estate of burdensome property is complemented by a fiduciary duty to the debtor to return burdensome property. For purposes of this determination, the Court is willing to assume the existence of such a duty. There will be ample opportunity later to decide whether it really exists.

**33.** Interestingly, an anomaly is presented by the facts of this case. If not for the fact that the antitrust claim was never scheduled, had Schott closed the case sooner (he could have), then the claim would have been abandoned to the debtor by operation of law. Under such circumstances,

CPC would be alleging as part of its complaint the failure to close the case before prescription. Here, however, had Schott closed the case earlier, the property would have remained property of the estate (see § 554(d)), and as such, could not have been prosecuted by the debtor. This is yet another issue which points out the equitable nature of the claim, and the extent to which the guts of the bankruptcy process hold the key.

In fact, the only way to resolve the tangle is to peer into the middle of the "administration of the res" process because equity-provided alternative perspectives abound. Could CPC argue that Schott owed it a duty to force it to schedule the antitrust claim so that it would have the "failure to close expeditiously" allegation against him? This involves the question of the scope of a trustee's fiduciary duty and the extent to which a party's unclean hands might have beneficial effect upon the complaining party's claim. Equity. Could Schott argue that it was in the estate's best interest to go ahead and say nothing about the claim, hoping that the debtor would mistakenly believe that it still possessed the claim and would expend funds to prosecute it (even after the estate was closed), given that the claim was unscheduled and would continue to be estate property? Equity.

As an alternative ground for relief, CPC has suggested that in the event Schott could not have validly abandoned the antitrust claim (because it had value to the estate) then he is liable for failure to prosecute the claim on behalf of the estate. *In re Bridges,* 31 B.R. 27 (Bankr.W.D.Ky.1983) discusses the fact that pursuit of litigation is a matter for the trustee's discretion:

> The trustee in bankruptcy, while occupying the position of an officer of the court having high accountability, must preserve independence of professional judgment in deciding whether to pursue litigation. There are many reasons why a trustee may choose not to sue. The cause of action may not appear meritorious, or the possibility of recovery slim, or the hopes of settlement encouraging.... Plaintiff is abundantly free to point out directly to the trustee the elements of an alleged (lawsuit), then leaving it in the discretion of the trustee as to whether to sue. That preliminary judgment is the trustee's alone to make. Only upon an abuse of that discretion would the Court direct the trustee to act.

31 B.R. at 28 (citations omitted). If *Bridges* is correct, and the decision to pursue litigation is a matter for the trustee's discretion, then this Court has the authority to review the trustee's decision for abuse of discretion. The ordinary procedural vehicle for challenging the trustee's decision in a matter concerning administration of estate assets is a motion filed by the interested party in the bankruptcy case. CPC filed no such motion, but now seeks to hold Schott liable for his decision not to pursue the antitrust claim. The question for present purposes is: does the decision to pursue litigation (or not to pursue it) involve administration of the estate, such that CPC's claim involves the equitable bankruptcy process. The answer to that question is an unequivocal "Yes."

Recall that the trustee's duty in a Chapter 7 case is to "collect and reduce to money the property of the estate for which such trustee serves." § 704(1). One of the assets of CPC's estate was the antitrust claim. The way to reduce such an asset to money is to resolve the claim, either through litigation or settlement. Consequently (and assuming that Schott knew of the unscheduled claim), Schott had a Bankruptcy Code-imposed duty to examine this claim and decide whether it was worth the estate's time, effort, and inherent costs.

Furthermore, there is no question concerning Congressional power to alter the scope of the bankruptcy process, as there was in *Granfinanciera.* This is not a situation in which Congress has sought to bring a formerly distinct remedy into the sphere of bankruptcy through a mere change in taxonomy. CPC's complaint alleges that Schott failed to liquidate an asset of the estate. If the equitable bankruptcy process contains anything at all, then it must contain the trustee's power to liquidate assets in a liquidation case, or, more particularly, the power to determine whether to liquidate assets. Whether CPC's claim against Schott is viewed as one challenging Schott's decision not to pursue the antitrust claim, or as one challenging his failure to abandon the (presumably) burdensome or worthless antitrust claim in time for CPC to pursue it, the result is the same: the complaint in this adversary proceeding raises a claim that challenges the trustee's decisions in the administration of the res in CPC's bankruptcy case.

The trustee's duty properly to administer the res on behalf of the estate's creditors (and, for purposes of discussion, the debtor) is an inherent part of the equitable process that makes up bankruptcy, and the particular decision making (or absence of decision making) complained of here is integral to this inherent part. Since the claim against the trustee seeks to hold the trustee liable for his part in administering the estate in a bankruptcy case, and since administration of the estate is an inherent part of this court's inherently equitable bankruptcy jurisdiction, it follows that CPC's claim is an inherently equitable claim seeking equitable relief. Therefore, Schott's motion to strike CPC's demand for a jury trial should be granted.

### Alternative analysis: CPC's claim as one alleging breach of fiduciary duty

While this court prefers to analyze the issue before it by determining the allow-

able scope of the bankruptcy process and deciding whether CPC's claim falls within that process, most other courts have addressed the issue from a more narrow perspective. They have attempted to determine the nature of the claim and the nature of the relief sought regardless of the broader context in which the claim arises (i.e., bankruptcy, labor relations, etc.). If the court analyzes the nature of CPC's claim from such a narrow perspective and ignores, for the moment, that it is a bankruptcy court (with historically equitable jurisdiction), and that this is a claim challenging the bankruptcy trustee's decisions regarding estate administration and abandonment (equitable powers), the result is the same. This is an equitable claim seeking equitable relief.

CPC has alleged that Schott damaged the estate by failing either to bring the antitrust action on behalf of the estate or abandon it so that CPC could bring the action. In so doing, perhaps CPC could be arguing that the trustee's duty to administer the res, which has as one of its integral components the power of abandonment, contains a duty which extends to the debtor. That is, perhaps CPC is arguing that the breached duty is the duty owed to initiate the abandonment proceeding on behalf of the debtor—"if you don't want the stuff, then you owe a duty to institute the proceedings available within the equitable universe that is bankruptcy estate administration so that the debtor obtains the greatest income possible." This very question generates the analysis of the equitable principles underlying the equitable process of bankruptcy estate administration and requires all parties to account for the cleanliness of their hands before they cast stones— here particularly, in light of § 554(b), which gives parties in interest (say, the debtor) standing to seek to compel the trustee to abandon property. This claim is essentially

an allegation that Schott breached his fiduciary duty (which somehow extends to CPC) by failing to pursue the litigation (a matter of discretion) or properly to exercise his discretionary power to abandon property under § 554. Thus, this case involves a claim against a bankruptcy trustee in his individual capacity for breach of the fiduciary duty imposed upon him by § 704(a) in that he failed to exercise his discretion under § 554 to act in a manner that would have preserved the value of property of the estate, if not for the estate or its creditors, then (after finding that the property had no value to the estate) for the debtor.

The vast majority of courts to rule on the issue has held that breach of fiduciary duty actions are equitable actions. *Chauffeurs, Teamsters and Helpers Local No. 391 v. Terry,* 494 U.S. 558, 567–68, 110 S.Ct. 1339, 1346, 108 L.Ed.2d 519 (1990) (citing 2 J. Story, Commentaries on Equity Jurisprudence § 960, at 266 (13th ed. 1886) and Restatement (Second) of Trusts § 199(c) (1959)); *In re Jensen,* 946 F.2d 369 (5th Cir.1991); *In re Hutchinson,* 5 F.3d 750, 757 (4th Cir.1993)("The basis for holding bankruptcy trustees liable is the equitable power of courts to enforce fiduciary duties."); *In re Evangelist,* 760 F.2d 27, 29 (1st Cir.1985); *In re Combined Metals Reduction Company,* 557 F.2d 179, 197 (9th Cir.1977) ("When a trustee has breached his trust, an equity court may hold him liable for any loss"); *In re Sunshine Trading & Transportation Company,* 193 B.R. 752 (Bkrtcy.E.D.Va. 1995); *In re Elegant Equine,* 155 B.R. 189, 192–93 (Bkrtcy.N.D.Ill.1993) (and cases cited therein); but see *Anderson v. United States,* 520 F.2d 1027 (5th Cir.1975) (stating in dictum that action against bankruptcy trustee for negligent failure to obtain discharge of corporate liability was an action at law).[34]

34. *Anderson v. United States* is a potentially troublesome case (though **not** cited by CPC as authority) that must be dealt with by this Court. Anderson sued the United States, and the government counterclaimed. Anderson named Emile Turner, who had served as trustee in an earlier bankruptcy case, as a third-party defendant in the counterclaim. Anderson alleged that Turner had negligently failed to obtain a discharge of certain corporate liabilities that the United States now wanted to collect from Anderson personally. Turner asked the district court to enjoin Anderson from proceeding against him until Anderson obtained permission from the bankruptcy court to proceed. The district court denied Turner relief, and the Fifth Circuit found that it had no jurisdiction over an appeal. In doing so, the court stated the following dictum: "It is clear that the underlying negligence action is one at law." *Anderson,* at 1029.

See also, *Bank of Marin v. England,* 385 U.S. 99, 102, 87 S.Ct. 274, 277, 17 L.Ed.2d 197, 200 (1966) ("There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction"). This is an issue that has been ruled upon by courts all over the country, and the Court is willing to accept the cited authority for the proposition that a claim for breach of fiduciary duty is an equitable claim.

While the above cases have specifically ruled that actions to recover for breach of fiduciary duty were equitable, there is a much larger group of cases that, while not explicitly dealing with the jury trial issue, involved breaches of fiduciary duty and were resolved without juries. In fact, the case that created the modern rule for bankruptcy

trustee liability, *Mosser v. Darrow, supra,* was such a case.[35] Recall that Darrow was being pursued by a successor trustee to repay, through surcharge, profits gained by insiders of the debtor through their conducting of bankruptcy estate business. Clearly, Darrow had intentionally placed these insiders, as employees of the trustee, into a position from which they could profit by trading in estate-owned securities. This Darrow did in his attempt to maximize the value of the estate. The requested surcharge was an attempt to make the estate the beneficiary of profits earned by the insiders, to question directly the trustee's administrative decision-making.

The case began as a proceeding before a special master in equity, rather than a jury

---

After careful consideration this Court has determined that the case, although issued by the Fifth Circuit, is not binding on the questions before the Court. Several factors lead to that conclusion: First, the statement was dictum. Second, due to the procedural and legal posture of the case, and the fact that Turner sought a stay rather than change of venue, Turner had to prove that the action against him was an action at law. He alleged that it was so, and apparently the issue was not disputed. Third, the fact that the court had no jurisdiction over the matter raises some doubt about the decision's precedential value, particularly since this Court undoubtedly does have jurisdiction. Finally, the facts leading to Turner's alleged negligence are not stated in the decision. Therefore, the Court finds it difficult to determine the extent to which the cases are distinguishable.

The weight of authority holds that an action for breach of fiduciary duty is equitable, while an action for negligence is legal. It seems likely that any unintentional breach of fiduciary duty could be characterized as "negligence" if the parties were so inclined, and this court is of the opinion that a constitutional right's applicability should not be determined by the label that a party places on its complaint. The issue here should not be whether Schott's behavior is properly characterized as negligence or as a breach of fiduciary duty. The issue is whether a claim raised in the bankruptcy court, a court of equity, that raises an allegation of breach of fiduciary duty, an equitable claim, for misuse of the equitable power of abandonment, which was created by courts of equity to assist the bankruptcy trustee in the equitable administration of the res, and which power is subject to review by a court of equity, is an equitable claim, or is instead a legal claim that gives rise to a Seventh Amendment right to a jury trial. That issue was not before the Fifth Circuit in *Anderson,* and this Court is convinced that the Fifth Circuit, when faced with the issue,

will not consider *Anderson* to be binding precedent.

**35.** The court has already cited several cases for the proposition that an action against a bankruptcy trustee creates no right to a jury trial. In addition to *Mosser v. Darrow, supra,* there is a host of published decisions in which the courts resolve the issue of trustee liability without ever expressly discussing the right to a jury trial. After a thorough search, the Court has found only two reported decisions, discussed in the text of this opinion, holding that an action against a trustee for breach of fiduciary duty generates a right to a jury trial. Opposed to these two decisions, the Court has found the following nonexclusive list of cases: *Connecticut General Life Ins. Co. v. Universal Ins. Co.,* 838 F.2d 612 (1st Cir. 1988); *In re Gorski,* 766 F.2d 723 (2nd Cir.1985); *In re Combined Metals Reduction Company,* 557 F.2d 179 (9th Cir.1977); *In re Johnson,* 518 F.2d 246 (10th Cir.1975); *In re Holywell Corporation,* 177 B.R. 991 (S.D.Fla.1995); *In re San Juan Hotel Corporation,* 71 B.R. 413 (D.P.R.1987); *Chappel v. First Trust Co. of Appleton, Wis.,* 30 F.Supp. 765 (E.D.Wis.1940); *In re Rollins,* 175 B.R. 69 (Bkrtcy.E.D.Cal.1994) (Issue of trustee liability raised on motion); *In re Barrows,* 171 B.R. 455 (Bkrtcy.D.N.H.1994); *In re Charlestown Home Furnishing,* 150 B.R. 226 (Bkrtcy.E.D.Mo. 1993); *In re George Schumann Tire and Battery Company, Inc.,* 145 B.R. 104 (Bkrtcy.M.D.Fla. 1992); *In re Melenyzer,* 140 B.R. 143 (Bkrtcy. W.D.Tex.1992); *In re Sturm,* 121 B.R. 443 (Bkrtcy.E.D.Pa.1990); *In re Center Teleproductions, Inc.,* 112 B.R. 567 (Bkrtcy.S.D.N.Y.1990); *In re Consupak, Inc.,* 87 B.R. 529 (Bkrtcy.N.D.Ill. 1988) (Court's motion to surcharge trustee); *In re Reich,* 54 B.R. 995 (Bkrtcy.E.D.Mich.1985); *In re 2001 Cincinnati, Inc., VIP Clubs of America,* 43 B.R. 6 (Bkrtcy.S.D.Ohio 1984); *In re Happy Time Fashions, Inc.,* 7 B.R. 665 (Bkrtcy.S.D.N.Y. 1980).

trial, *In re Federal Facilities Realty Trust,* 97 F.Supp. 622, 623 (N.D.Ill.1949), and proceeded to the Supreme Court upon the district court's affirming of the special master's determination that a surcharge should issue, after analysis of Darrow's accounts. When the case reached the Supreme Court, the remedy the court enforced against the trustee was not a legal judgment, but a surcharge against his accounts, which is, by definition, an equitable remedy imposed against fiduciaries who wilfully or negligently violate their duties. Black's Law Dictionary 1292 (6th Deluxe Ed.1990). The liability of Darrow was personal, specifically so, and payable in dollars. Therefore, while the successor trustee was seeking an accounting, etc., he really wanted the equitable version of a legal judgment: PAY ME DOLLARS, NOW. *Mosser* did not involve negligence (see above discussion), but as regards the CPC complaint, neither does this case. Thus, the Court finds that, while its preferred focus on the component parts of the bankruptcy process may be unusual, its result, that CPC's claim is an equitable claim seeking equitable relief, is supported by an overwhelming majority of the cases to consider the issue.

 The two cases CPC cites in support of its contrary position are *Petrino v. Eley,* 146 B.R. 267 (D.Colo.1992) and *Bertholet v. Harman,* 126 B.R. 413 (Bkrtcy.D.N.H.1991). The *Petrino* court stated without citation of authority that a claim for breach of fiduciary duty constitutes a legal claim. As has been shown, the majority of courts has held otherwise. The *Bertholet* court distinguished prior cases holding that a claim against a trustee was equitable. The *Bertholet* court found that in these prior cases, the claim against the trustee was brought by a successor trustee, while in *Bertholet* the claim was brought by the debtor. According to the *Bertholet* court, that fact led to the conclusion that any recovery to be had would benefit the debtor personally rather than the estate, and the claim was therefore legal. However, the equitable nature of the claim does not depend on the identity of the plaintiff. Rather, the legal or equitable nature of the claim depends on the extent to which the claim implicates the bankruptcy process. This Court finds *Petrino* and *Bertholet* to be incorrect

statements of the law and declines to find in them any precedential value.

CPC also cites *In re Jensen,* 946 F.2d 369 (5th Cir.1991). That case involved state law tort claims that arose pre-petition and were filed by the debtors in state court pre-petition. After the debtors filed their Chapter 11 petition, the defendants in the state court tort actions removed those actions to the bankruptcy court. Obviously the state-law tort actions were independent of the bankruptcy case since they were filed pre-petition. The Fifth Circuit in *Jensen* simply recognized that the fact that the Jensens filed a bankruptcy petition did not deprive them of their right to a jury trial on previously filed state law tort actions. This conclusion lines up squarely with the Supreme Court's cases which distinguish an action by the estate against a non-creditor from the inherently equitable process of administration of the res. Of course, under *Jensen,* as required by *Granfinanciera,* et al., the pre-bankruptcy tort (or breach of contract) claim is not integral to estate administration. In *Jensen* the court concluded that as the tort claim was separate from the creditors' claims, it was separate from, and did not implicate, the claims allowance process. The case is irrelevant to what we have here.

CPC's claim against Schott arose solely because of CPC's bankruptcy case and the administration of that bankruptcy case by Schott. If CPC had not been in bankruptcy, Schott would never have been appointed trustee and would never have had the opportunity or power to abandon property of the estate. CPC now seeks a jury trial on the issue of the trustee's failure to abandon the claim until it was too late. The antitrust claim may not have arisen during the course of the bankruptcy proceeding, but Schott's involvement in the case certainly did. *Jensen* is fundamentally distinguishable from this case on the determining issue: whether or not the claim for which a jury trial is sought is inextricably intertwined with the bankruptcy case. In *Jensen,* the state-law tort claims were utterly distinct from the bankruptcy case and, in fact, preceded it. Here, the claim against the trustee is derived from the guts of the bankruptcy case, and its

resolution will require a re-examination of the manner in which the bankruptcy case was handled.

As the court in *Jensen* pointed out, "there may be situations in which an award of monetary relief is equitable." Id., at 372. This is one of those situations. Although CPC is seeking a money judgment against Schott, that judgment, if granted, would constitute a surcharge against Schott and his accounts as trustee. In other words, Schott would be held liable for restitution of the value of the estate property he had a fiduciary obligation to protect (for either the estate or the debtor): the antitrust claim. Restitution is an equitable remedy. A claim for a trustee's breach of fiduciary duty is an equitable claim. Again, *In re Jensen* is inapposite.

CPC also relies upon *Chauffeurs, Teamsters and Helpers Local No. 391 v. Terry*, 494 U.S. 558, 567–68, 110 S.Ct. 1339, 1346, 108 L.Ed.2d 519 (1990). In that case, McLean Trucking Company and the Union were parties to a collective-bargaining agreement which covered the employee-plaintiffs. The plaintiffs believed that certain of McLean's policies concerning layoffs and recalls violated the terms of the collective bargaining agreement, and they asked the union to refer their complaint to the relevant grievance committee. The Union refused. The disgruntled employees sued the union, alleging breach of the duty of fair representation, and McLean, alleging breach of the terms of their collective bargaining agreement. Before the case reached the Supreme Court, McLean filed bankruptcy and was dismissed from the plaintiffs' lawsuit.

The plaintiffs in *Terry* argued that the union's duty of fair representation was akin to an attorney-client relationship and argued that they were entitled to a jury trial, just as the plaintiff in a legal malpractice action would be. The *Terry* court concluded, by majority, only one thing: plaintiffs were entitled to a jury trial. It concluded, as a court, nothing as to why.[36] Justice Marshall, writing for four justices, in fact rejected the analogy proposed by the plaintiffs and concluded that the plaintiffs' claim against the union was more like a claim for breach of fiduciary duty. *Terry*, 494 U.S. 558, 568, 110 S.Ct. 1339, 1345. The Court concluded that a breach of fiduciary duty claim is fundamentally different from a legal malpractice claim, and a majority concluded that the claim against the union was equitable in nature. A client can fire an attorney, and a client controls the essential aspects of the representation. Neither option is available to a union member with respect to union leadership. The claim against the union, if anything, is less of a breach of fiduciary duty claim than that against a bankruptcy trustee for acts undertaken, or not undertaken, within the realm of estate administration.

Though Marshall determined that the claim against the union for breach of the duty of fair representation was an equitable claim, he stated that the plaintiffs, in order to prevail on the equitable claim against the union, must prove as a preliminary issue that McLean had breached the collective bargaining agreement. Since the collective bargaining issue was obviously legal and was an element of the claim against the union, the Court concluded that the nature of the action was at least partially legal.[37] He then found

36. Justice Marshall, writing for himself and three other justices, decided that the jury trial right arose because of the merger of the legal claim against the employer into the equitable claim against the union. Justice Brennan, concurring in judgment, found a jury trial right purely on the basis of the recovery requested, i.e. back pay. Justice Stevens found the action against the union to be more akin to the malpractice claim. The dissent concludes that the action against the union was a breach of fiduciary duty claim and therefore equitable, and that the breach of contract action did not displace the equitable nature of the action, and that the plaintiffs were not entitled to a jury trial. From a substantive, analytical perspective, then, the only idea common

to a majority of the members of the court was that the action against the union was a breach of fiduciary duty action, equitable in nature. We will refer to Justice Marshall's opinion as that "of the Court," though, technically, it was not.

37. In footnote 6 of the majority opinion, the Court explains this process of unequitization of the legal claim by stating: "The claim we confront here is not typical; instead, it is a claim consisting of discrete issues that would normally be brought as two claims, one against the employer and one against the union ... The Seventh Amendment analysis should not turn on the ability of the plaintiff to maintain his suit against both defendants." 494 U.S. at 570, 110 S.Ct. at

that the legal and equitable issues involved were "in equipoise," *Terry, supra,* at 570, 110 S.Ct. at 1347, and that under the circumstances the right to a jury trial should be upheld. Most important to the Court's analysis was the fact that the remedy sought was back pay. The back pay award was legal rather than equitable, and that fact tilted the balance in favor of a jury trial (of course, what this has to mean is that the union was, in Louisiana parlance, solidarily liable with the employer for back pay, which seems somewhat incorrect). The overriding problem caused by *Terry* in its rush to jury trial right is its failure to consider the fact of the bankruptcy of the employer. The effect, from the plaintiffs' perspective, was that they could file a claim and obtain a final judgment on its allowability, through the summary process of claims allowance. This would have expedited the resolution of their claim through a process created by Congress and would have provided them the prospect of quick resolution of both actions. To hold that converting a legal claim into an equitable one converts a previously equitable claim, of which the formerly-legal-now-equitable action is a component, into a legal claim, without ever considering the conversion of the

legal claim to an equitable one, is, to us, mind-boggling and problematically result-oriented.

CPC attempts to bootstrap its way to a jury, through a version of this *Terry* unequitizing analysis, by arguing that Schott's liability depends upon the merits of the underlying antitrust claim and that the antitrust claim is legal. This assertion is erroneous.[38] *Terry* dealt with a two-pronged action against two parties which, as erroneously ascertained by the Court, dwindled to the same action against one of the parties upon the bankruptcy of the other. The contract and fiduciary duty claim arose from the same alleged transaction and occurrence, i.e., the breach of contract by the employer. If there had been no breach of contract by the employer, there could not (says the court) have been a breach of fiduciary duty claim, or, put another way, the breach of fiduciary duty claim was dependent upon the finding of breach of contract. In this case, the antitrust claim, to the extent it existed, pre-existed the bankruptcy estate, was, in and to itself, a claim grounded in a set of facts and occurrences exclusive of the bankruptcy process and the trustee's involvement with the

1347. What we think the court means here is that the plaintiffs, having a jury trial right against one defendant on a breach of contract claim (the employer in the collective bargaining issue), should not lose the right to jury trial simply because it no longer can bring the action against the (only) defendant potentially liable for breach of contract. This "process" of unequitizing an action is finished off by the (to be as kind as we can) rather hazy suggestion that if the issue making up the legal action (though only bringable against another party) is somehow an issue underlying the equitable action, then, if the legal action cannot be brought against that other party (due to it being converted into an equitable action—through the claims allowance process), the equitable action (which is now two equitable actions) is converted into a legal one for jury trial purposes. The court thus reached the startling conclusion that an equitable claim against a labor union *for violating its duty of fair representation* is converted into a legal claim when the party against which the legal claim (for breaching a collective bargaining agreement) was brought, the employer, files for (equitable) bankruptcy relief. The usual bankruptcy analysis is that a creditor's legal claim against a debtor is exchanged for an equitable claim to a *pro rata* share of the estate under the bankruptcy court's constructive possession. In *Terry,* by contrast,

the employer's bankruptcy (which involved the submission of all assets to the equitable jurisdiction of the bankruptcy court), rather than converting legal claims to equitable ones, somehow converted the employees' equitable claim against the union into a legal one, because the employees were now faced with one defendant instead of two. Remember, the plaintiffs did not lose their right to assert the breach of contract claim, they simply decided to forego the breach of contract action (which they still had), complain a bit about not having it any more (given the bankruptcy), and thereafter assert that the now completely equitable universe in which both claims existed was magically (and mysteriously) now a legal universe, with jury trial for all on everything. This Court has previously been made to realize the limitations on its powers of comprehension, but rarely in such a bewildering manner. The logic of the *Terry* opinion is extraordinarily elusive.

38. This argument is a reflection of the extent to which the Supreme Court owes a duty to inferior courts not to issue opinions that are like shiny baits, situated to attract arguments for anything because *the opinion can be pointed to as saying anything* (which is no different from observing that, analytically, the opinion says nothing).

CPC estate. The alleged asset, says the debtor, is now gone. The debtor argues that just as the union in *Terry* was charged with the protection of the plaintiff's interests in view of the breach of contract claim, Schott was charged with the protection of the debtor's (and its owner's) interests in the antitrust claim. Just as it was necessary to determine the breach of contract claim, it is necessary to determine whether the debtor would have won the antitrust claim. There are, however, some differences between this case and *Terry*.

First, notwithstanding the legal nature of the antitrust claim, it was, as an estate asset, a part of the res subject to constructive possession by the Court. As such, this Court maintained control over its disposition, within the areas of, for example, abandonment, settlement and compromise, fee and expense reimbursement, and control of any proceeds generated. In fact, had the trustee not finally abandoned the claim, the estate (and the Court) would have retained it in perpetuity, as it was not scheduled. Oversight by another court could only have occurred had the trustee decided to prosecute it, and even then, final authority over the aforementioned questions and issues would have remained here.

The aberrational nature of *Terry* is revealed by debtor's argument, or, perhaps it is the incorrect reading by the debtor of the case that is revealed. According to the logic of the debtor, a debtor or other party in interest who objected to a proposed settlement and compromise of an estate action against a non-party (say, this antitrust claim) would have the right to a jury trial of their objection, as resolution of the underlying claim (legal in nature) would be required before this Court could determine whether to approve a proposed settlement and compromise. Clearly, this is not correct.

Now, can we get to the essential difference, if there is one other than what has been mentioned, or are we espousing essentially flannel-mouthed verbiage because *Terry*, so wrongly decided, leaves us no alternative? Though to some extent our backs are placed against the wall by the illogic of *Terry*, we think maybe even the *Terry* court could not have used sufficient imagination to override another distinction warranting mention.

Recall how we started, that the antitrust claim preceded the formation of the estate. The claim against Schott proceeds upon the premise that there is a claim (maybe worth something, maybe not) that, in fact, was ultimately abandoned by Schott. *Terry* involved a different situation. The same transaction and occurrences giving rise to the legal claim gave rise to the equitable claim. Pretty clearly, they were, in essence, different versions of the same claim; certainly, the two claims arose out of the exact same transaction and occurrences that **allowed the two defendants to be joined in a single lawsuit, from inception.** The court, we think, was incorrect in concluding that because there previously existed a jury trial right against the employer, the jury trial right could migrate over to the equitable claim against the union; however, the fact of the existence of the antitrust claim in no way establishes that Schott could have been joined as a defendant in the antitrust action so that, notwithstanding that a jury trial right existed, once the antitrust claim was dismissed on the basis of prescription, the debtor could allow the jury trial right to migrate over to the claim against Schott. The claims are distinct; the claims arise out of different sets of transactions and occurrences; Schott could not have been joined as a co-defendant with the antitrust defendant (see Rules 19 and 20, Federal Rules of Civil Procedure) in hopes that the debtor, if the antitrust claim would be dismissed, could assert—now I have only one person against whom I can march and, therefore, am entitled to assert my jury trial right (existing on the antitrust claim) against him. This cannot be.

*Terry*, whatever it stands for, does not stand for the proposition that a classic equitable action for breach of fiduciary duty is converted to a legal action with a jury trial right because the plaintiff has a separate legal claim against someone else that pre-exists the establishment of the trust. This argument is nothing more than that the breach of fiduciary duty action is in reality a malpractice action, which was one of the only things about which the majority of the *Terry*

court agreed. CPC would characterize the breach of fiduciary duty claim as wholly dependent upon the merits of the antitrust claim, when in fact Schott's liability will be determined by the duties imposed upon him by the Bankruptcy Code.[39] Many things will have to be considered, among them (nonexclusively): the scope of duty; the ability of a debtor to bring the claim when no motion to compel abandonment was even filed; the extent to which the trustee's duty is affected by the failure of the debtor to schedule the antitrust claim; the scope of the trustee's business judgment given the age of the claim; and the existence of the claims against the estate. The trustee was the representative of the estate, not a lawyer hired by the debtor to file and prosecute a lawsuit. The underlying merits of the antitrust action may have some relevance to the ultimate claim—breach of fiduciary duty—but the breach claim is not dependent for its existence on the antitrust claim being, conclusively, meritorious.

The claim currently before the Court is analogous to the claim against the union in *Terry*. There, the court found that the plaintiffs' claim against the union was equitable, in part because the facts that the union members had no option to fire the union leadership and no power to control the significant parts of the relationship rendered the action more like a breach of fiduciary duty action than a legal malpractice claim. Likewise, neither option is available to a debtor in bankruptcy with respect to the trustee. If the action in *Terry* was analogous to a breach of fiduciary duty action and therefore equitable, then CPC's action is also equitable because it is a breach of fiduciary duty action and nothing else. There is no legal claim in

this case to balance against the equitable nature of the alleged breach of fiduciary duty. If Schott is liable at all, it is because he failed in his duty as a bankruptcy trustee in connection with actions or inactions that exist at the heart of the inherently equitable bankruptcy process. There is no other basis upon which CPC can proceed. There is, for example, no contractual relationship between CPC and the trustee, of which CPC can claim breach (as there was in *Terry*). Any claim in this case emanates from the interactions of the equitable triumvirate of trustee, estate, and debtor. There is no equipoise here, only equity. CPC's reliance on *Terry* is misplaced.

■ CPC also cites *Terry* for the proposition that monetary damages are equitable only when they are (i) restitutionary or (ii) accompanied with injunctive relief. This Court acknowledges that holding and observes that CPC's reliance is again misplaced. As stated above, the damages sought by CPC in this case are restitutionary and therefore equitable. In *Terry* the union members sought compensation in the form of back pay. The court held that the proposed compensation was not equitable, but legal. CPC isn't seeking back pay. Nor is it seeking money it "would have received had the trustee properly filed" the antitrust claim, as alleged in its brief. If Schott had filed and prevailed upon the antitrust claim, the **estate** would have received money. CPC would have received money only if Schott had won and all of CPC's creditors had been paid in full from the judgment proceeds. If Schott had abandoned the claim and CPC filed on its own behalf, any recovery would have been obtainable by CPC's creditors, since CPC received no discharge. CPC seeks compen-

**39.** While Schott's potential *liability* in failing to abandon the antitrust claim is largely independent of the merits of that claim, it is obvious that CPC was *damaged* by the failure to abandon timely, if at all, only to the extent that the antitrust claim was meritorious. However, to the extent that the claim was meritorious, Schott was not justified in abandoning it. Instead, he should have administered this asset for the benefit of the estate by bringing the action himself. CPC is seeking damages against Schott for failure to do something that, if the facts are as CPC asserts them to be, Schott should not have done. CPC is advancing the following position: a jury should decide that either Schott or the bankruptcy judge in this case (myself) would have found that the antitrust claim was worthless or burdensome to the estate, and the jury must further find that both Schott and the bankruptcy court would have been wrong, because the claim had sufficient value to pay all creditors, plus a little left over for CPC. Ignoring the internal inconsistency of this position, the Court must point out that it is in a much better position than a jury to determine what it would have found concerning the value of the antitrust claim in connection with an abandonment motion, settlement of the antitrust claim (had Schott brought it), etc.

sation for Schott's purported failure to administer the estate properly, not for the money it might (possibly) have won. According to CPC's allegations, the antitrust claim was rendered worthless because of the wilful (or negligent) breach of Schott's fiduciary duty to the estate, and thereby, through some sort of extension upon the equitable power of abandonment, of his duties to the debtor. Such compensation is restitutionary, as is evidenced by the definition of "surcharge." Black's Law Dictionary 1292 (6th ed.1990). See *In re Hutchinson, supra.*

To obtain relief on its claim, CPC must engage itself and the Court in a recapitulation of the CPC estate properly administered (assuming that its factual allegations concerning the trustee's intentional disregard of its numerous protestations are true so as to generate a claim at all). The trustee as defendant will perhaps have an alternative perspective. The substance of the antitrust claim is only one among many components of the puzzle being put together here. It is not the be-all, end-all, over-arching nature of the claim. Again, this is not *Terry.*

The Court notes that CPC alleged in its complaint that Schott "committed wilful and deliberate acts in violation of his fiduciary duties," and the Court has accepted CPC's characterization of the nature of his claim for the purposes of the above analysis. However, the Court is aware that the Federal Rules of Civil Procedure, applicable to this Court through incorporation in the Bankruptcy Rules, have abolished technical forms of pleading in favor of notice pleading. Therefore, CPC is not presently bound by its characterization of Schott's actions as "willful and deliberate acts in violation of his fiduciary duties." CPC Amended Complaint, ¶ 7. CPC might also argue that its claims sound in negligence or intentional tort and are therefore purely legal.

The Court has already pointed out that almost any unintentional breach of fiduciary duty can be characterized as negligence. By the same logic, any intentional breach of fiduciary duty can be characterized as an intentional tort. There is authority for the proposition that the very act of negligence or wilful infliction of injury that would give rise to a tort claim is the same act that creates the breach of fiduciary duty, and that the action is converted to an equitable action because the office of trustee is inherently equitable, and the trustee is necessarily subject to the authority of the court of equity that appoints him. *In re Barrows,* 171 B.R. 455 (Bkrtcy.D.N.H.1994). Also, we have pointed out that if negligence is the ultimate basis upon which CPC might proceed, there's an abundance of federal trust law regarding the requirement of "fraud, or supine negligence equivalent to fraud," that as a matter of equity will or will not establish the standard of trustee liability from the equitable perch of a breach of fiduciary duty claim.

### The Barton Doctrine

Although the Court has provided ample grounds for granting Schott's motion, an additional alternative ground may exist. CPC's request for a jury trial also appears contrary to the *Barton* doctrine. In *Barton v. Barbour,* 104 U.S. (14 Otto) 126, 26 L.Ed. 672 (1881), the Supreme Court announced a rule that railroad receivers could be sued in their representative capacity only by leave of the appointing court. The doctrine later expanded to include claims against bankruptcy trustees and to include claims against such persons in their personal capacity, as well as their representative capacity. *In re Lehal Realty Associates,* 101 F.3d 272, 276 (2nd Cir.1996), and cases cited therein. Congress has enacted 28 U.S.C. § 959, paragraph (a) of which overrules that part of the *Barton* doctrine that protects bankruptcy trustees who are carrying on the business of the estate.[40] However, Schott is not being sued

---

**40.** 28 U.S.C.A. § 959. Trustees and receivers suable; management; State laws

(a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected

with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

(b) Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in

for anything he may have done in "carrying on the business" of CPC. Rather, he is being sued to determine whether he should have abandoned property of the estate more quickly than he did. This Court has not granted leave for the matter to be tried before another court, and within the context of the *Barton* doctrine, the Court finds no meaningful difference between another court and a jury. See *Chappel v. First Trust Co. of Appleton, Wisconsin,* 30 F.Supp. 765 (E.D.Wis.1940) (In ruling that the court was without jurisdiction to hear a complaint against a bankruptcy trustee, the court stated: "A trustee in bankruptcy is an officer of the court which appoints him. If his conduct is wrongful as to the assets belonging to the bankrupt estate, he is accountable to the bankruptcy court and to no other."); *In re Markos Gurnee Partnership,* 182 B.R. 211 (Bkrtcy.N.D.Ill.1995) (holding that an action against a trustee for breach of fiduciary duty must be brought in the court that appointed the trustee). See generally, *In re DeLorean Motor Company,* 991 F.2d 1236 (6th Cir. 1993) (*Barton* doctrine barred action against trustee in non-appointing forum).

The Court recognizes that, in a conflict between the Seventh Amendment and a judicially created doctrine, the amendment will prevail. However, the Court sees no conflict between the two. Rather, the existence of the *Barton* doctrine is further evidence in support of the Court's conclusion that the Seventh Amendment does not extend to cases of this type because the relief they seek is inherently equitable.

### Conclusion

The nature of the relief sought by CPC, that of surcharging a bankruptcy trustee for improper administration of the bankruptcy estate (consisting, primarily, of the failure to appropriately use a power (abandonment) created by the equity courts to assist a trustee in going about his equitable business), is inherently equitable and inextricably involves the equitable bankruptcy process (as it has historically been defined). Also, because the action for breach of fiduciary duty was historically brought before a court of equity and the relief being sought, restitution, is equitable, this Court finds that this adversary proceeding raises an equitable claim and that the Seventh Amendment is not implicated in this case. See, in addition to everything that has been cited thus far, *In re Hooper,* 112 B.R. 1009 (9th Cir. B.A.P. 1990); *In re Sunshine Trading & Transportation Company,* 193 B.R. 752 (Bkrtcy.E.D.Va.1995); *In re Elegant Equine,* 155 B.R. 189 (Bkrtcy. N.D.Ill.1993); *In re American Solar King,* 142 B.R. 772 (Bkrtcy.W.D.Texas 1992); *In re Brenner,* 119 B.R. 495 (Bkrtcy.E.D.Pa.1990); *In re E Z Feed Cube Co.,* 115 B.R. 684 (Bkrtcy.D.Or.1990); *In re Dunoco Corp.,* 56 B.R. 137 (Bkrtcy.C.D.Cal.1985). Consequently, Schott's motion to strike will be granted.[41] A separate order will issue.

any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

41. This result obviates the need for a determination of whether Carter's claim implicates a "public right." At least one bankruptcy court has held that the official actions of a bankruptcy trustee involve public rights. *In re Brenner,* 119 B.R. 495, 497 (Bkrtcy.E.D.Pa.1990). Because there are other grounds for holding that there is no right to a jury trial in this matter, and because the Fifth Circuit has indicated that it is somewhat skeptical of whether the public rights doctrine as it now exists can provide any jurisdictional clarity to the bankruptcy process, *In re Clay,* 35 F.3d 190 (5th Cir.1994), this Court offers no opinion on the public rights issue. Furthermore, shortly after *Granfinanciera,* the Supreme Court called into question the import of the public rights issue. See *Chauffeurs, Teamsters and Helpers Local No. 391 v. Terry,* 494 U.S. 558, 565 n. 4, 110 S.Ct. 1339, 1345 n. 4, 108 L.Ed.2d 519 (1990).